Argued and submitted August 19, 2003, reversed and remanded April 28, appellants' petition for attorney fees filed May 18; appellants' memorandum of law on right to attorney fees filed May 18; respondents' objection to petition for attorney fees filed June 1; and appellants' reply memorandum on right to attorney fees filed June 15, denied by opinion August 4, 2004
See 194 Or App 419, 95 P3d 731 (2004)
Petition for review on the merits allowed August 10, 2004 (337 Or 282)

Carol BOBO,
Perry Atkinson, Gary George,
Robert Fulton Ekstrom, Solomon Yue, Jr.,
June Hartley, and Jeffrey Grossman,
*Appellants,*

*v.*

John KITZHABER,
Mike Greenfield,
and the State of Oregon,
*Respondents.*

01C-15710; A120098

89 P3d 1189

Gregory W. Byrne argued the cause and filed the briefs for appellants.

Mary H. Williams, Solicitor General, argued the cause for respondents. With her on the brief was Hardy Myers, Attorney General.

Before Haselton, Presiding Judge, and Landau and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Plaintiffs appeal the trial court's summary judgment in favor of defendants[1] in this declaratory judgment action in which plaintiffs seek to have the amount of the 2001 income tax "kicker" increased by over $113 million. For the reasons set forth below, we conclude that, under a proper construction and application of ORS 291.349, plaintiffs are entitled to prevail.[2] Accordingly, we reverse and remand.[3]

Plaintiffs are Oregon taxpayers. The essence of their claim is that, for the reasons set forth in more detail below, the state incorrectly determined the amount of money available for "kicker" tax refunds to taxpayers for the 1999-2001 biennium, thus reducing the "kicker" tax refund by about one-third—more than $113 million. In the trial court, both parties moved for summary judgment. The trial court denied plaintiffs' motion and granted the state's motion. Plaintiffs appeal, arguing that the trial court erred as a matter of law in interpreting and applying the legislation that authorized the transfer of certain monies into a new account and that, alternatively, if the trial court interpreted and applied the legislation correctly, the legislation ran afoul of Article IV, sections 18, 20, and 25, of the Oregon Constitution. We do not reach the constitutional issues because we find that one of plaintiffs' statutory arguments is well taken.

---

[1] Named as defendants are former governor John Kitzhaber, Mike Greenfield, the former director of the Oregon Department of Administrative Services (DAS), and the State of Oregon. For the sake of simplicity, we refer to defendants as "the state" throughout the opinion.

[2] Much of the statutory language of ORS 291.349, discussed below, is identical to language found in Article IX, section 14, of the Oregon Constitution. However, Article IX, section 14, went into effect on July 1, 2001, after the end of the biennium at issue in this case. Accordingly, plaintiffs' arguments are, necessarily, based on the statute and not on the constitutional provision. We emphasize that our analysis here pertains exclusively to the statute and not to the constitutional provision.

[3] We observe that the members of this court are Oregon taxpayers, and we thus invoke the "rule of necessity" in deciding this case. *See Woodward v. Pearson*, 165 Or 40, 58, 103 P2d 737 (1940) ("Our interest as taxpayers attends in every case where a fellow taxpayer seeks to enjoin the payment of money derived from taxation; but by reason of the fact that no tribunal is available unattended by the same disqualifying interest wherein the issues of such a case may be determined, this court and other courts composed of tax-paying judges have been compelled to hear and decide such issues.").

■    In an appeal from a judgment that results from cross-motions for summary judgment, if both the granting of one motion and the denial of the other are assigned as error, then both are reviewable. Each party has the burden of demonstrating that there are no material issues of fact and that the movant is entitled to judgment as a matter of law. We review the record for each motion in the light most favorable to the party opposing it. *Eden Gate, Inc. v. D&L Excavating & Trucking, Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002). In this case, the parties agree that the pertinent facts are not in dispute, and that the disputed issues are issues of law.

ORS 291.349(1) provides, in part:

"As soon as practicable after adjournment sine die of the regular session of the Legislative Assembly, the Oregon Department of Administrative Services shall report to the Emergency Board the estimate as of July 1 of the first year of the biennium of General Fund * * * revenues that will be received by the state during that biennium. * * * The report shall contain the estimated revenues from corporate income and excise taxes separately from the estimated revenues from other General Fund sources."

Pursuant to that statute, after the adjournment of the 1999 regular session of the legislature, the Oregon Department of Administrative Services (DAS) estimated that the General Fund revenues for the 1999-2001 biennium other than from corporate income and excise taxes would be $9,112,459,000. That sum included $80,069,114 in anticipated Medicaid Upper Payment Limit funds (MUPL funds), which the 1999 legislature had explicitly directed were to be transferred to the General Fund, beginning July 1, 1999. *See* Or Laws 1999, ch 16, § 9.[4]

During the 1999-2001 biennium, the General Fund revenues other than from corporate income and excise taxes

_____

[4] Oregon Laws 1999, chapter 916, section 9, provided, in part:

"(2) That portion of the payment received during the biennium beginning July 1, 1999, by the Department of Human Resources from health districts in this state under the Proportionate Share Incentive Adjustment State Plan Amendment to the State Medicaid Plan and under intergovernmental agreements with the health districts that is attributable to the federal funds portion of the total payment made by the department to the health districts during the biennium beginning July 1, 1999, shall be transferred to the General Fund."

received by the state totaled $9,366,962,167, not including the MUPL funds. The state also received $113,249,821 in MUPL funds, which were deposited into the General Fund.

ORS 291.349(4) describes the circumstances in which the state is obligated to pay a "kicker" refund to eligible personal income taxpayers:

"If the revenues received from General Fund revenue sources, exclusive of those described in subsection (3) of this section [corporate income and excise taxes], during the biennium exceed the amounts estimated to be received from such sources for the biennium, as estimated after adjournment sine die of the regular session, by two percent or more, there shall be refunded from personal income tax revenues an amount equal to the total amount of that excess, reduced by the cost certified by the Department of Revenue under ORS 291.351 as being allocable to payments described under this subsection. The excess amount to be refunded shall be paid to personal income taxpayers in a percentage amount of prior year personal income tax liability as determined under subsection (6) of this section."

Thus, under ORS 291.349(4), when "revenues *received from General Fund revenue sources*" during a biennium exceed the projections previously made under subsection (1) by more than two percent, the excess is refunded to personal income taxpayers in the form of "kicker" checks issued pursuant to the methodology prescribed in ORS 291.349(6).

On June 11, 2001, three weeks before the end of the 1999-2001 biennium, the 2001 legislature enacted Senate Bill (SB) 963. Senate Bill 963 provided:

"SECTION 1. (1) The Medicaid Upper Payment Limit Account is established in the State Treasury separate and distinct from the General Fund. Moneys in the account are continuously appropriated to the Oregon Department of Administrative Services for health-related programs.

"(2) The Department of Human Services shall transfer to the Medicaid Upper Payment Limit Account that portion of the payment received by the department from health districts in this state under the Proportionate Share Incentive Adjustment State Plan Amendment to the State Medicaid Plan and under intergovernmental agreements with the

health districts that is attributable to the federal funds portion of the total payment made by the department to the health districts during the biennium.

"SECTION 2.   Section 9, chapter 916, Oregon Laws 1999, is repealed.

"SECTION 3.   The requirement established by section 1(2) of this 2001 Act, that the Department of Human Services transfer described payments to the Medicaid Upper Payment Limit Account, *applies to payments received by the department before the effective date of this 2001 Act*, as well as to payments received on or after the effective date of this 2001 Act.

"SECTION 4.   This 2001 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2001 Act takes effect on June 30, 2001."

(Emphasis added.) The governor signed SB 963 into law on June 18, 2001.

On June 28, 2001—two days before SB 963's effective date—the Department of Human Services (DHS) transferred $113,249,821 of MUPL funds out of the General Fund and into the newly created Medicaid Upper Payment Limit Account.

After the adjournment of the legislature, the amount of "kicker" tax refunds for the 1999-2001 biennium was calculated pursuant to ORS 291.349(4).   That calculation *excluded the MUPL funds that had been transferred out of the General Fund and into the newly created account just before the end of the biennium pursuant to SB 963*. If those funds had been included, the amount of the 2001 personal income tax "kicker" would have been $367,752,988. Without those funds, the amount of the 2001 "kicker" was calculated as $254,503,167.

In June 2001, plaintiffs initiated this action for declaratory and injunctive relief, asserting that they, as taxpayers, were entitled to have their "kicker" refunds for the 1999-2001 biennium calculated based on the inclusion of the MUPL funds as "revenues received from General Fund revenue sources." ORS 291.349(4). Specifically, they sought to

(1) enjoin the state to include the MUPL payments in computing the 2001 "kicker" under ORS 291.349; (2) require DAS to revise its 1999 estimate of General Fund revenues to exclude the amount of MUPL funds the state expected to receive during the 1999-2001 biennium; or (3) have SB 963 declared unconstitutional. Plaintiffs further asserted an entitlement to attorney fees pursuant to *Deras v. Myers*, 272 Or 47, 535 P2d 541 (1975). The parties stipulated to most of the relevant facts and filed cross-motions for summary judgment. The trial court denied plaintiffs' motion and granted the state's motion.

On appeal, plaintiffs argue that the trial court erred in denying their motion for summary judgment and granting the state's motion. Plaintiffs reiterate the arguments they made to the trial court. With respect to the proper interplay between SB 963 and ORS 291.349, plaintiffs advance three primary statutory arguments. *First*, SB 963, although directing transfer of the MUPL funds out of the General Fund, nevertheless did not alter the application of the formula set forth in ORS 291.349 for calculation of the kicker. That is so because that calculation is based on revenues *"received from* General Fund revenue sources." ORS 291.349(4) (emphasis added). Thus, plaintiffs assert, regardless of any subsequent transfer of the MUPL funds out of the General Fund, they were "received from General Fund revenue sources" during the biennium and must be included in the "kicker" calculation.

*Second*, plaintiffs assert, the MUPL funds were never lawfully transferred into the new account because the transfer actually occurred on June 28, 2001, two days before SB 963's effective date of June 30, 2001. Thus, the MUPL funds must be treated as remaining in the General Fund.

*Third*, plaintiffs contend that, even assuming that SB 963 could somehow retroactively recharacterize the MUPL funds as not having been "received from [a] General Fund revenue source" for purposes of the ORS 291.349(4) calculation, then DAS was required to concomitantly amend and reduce its July 1999 estimate of General Fund revenues under ORS 291.349(1) to exclude the projected MUPL funds from the estimate. That is, the MUPL funds had to be treated

the same way with respect to both components of the statutory "kicker" calculation—they could not be included in the initial projection for purposes of ORS 291.349(1) and then excluded from the calculation of funds actually received during the biennium for purposes of ORS 291.349(4).

As described below, we do not reach and resolve plaintiffs' second and third statutory arguments, or any of their constitutional arguments, because we agree with their first statutory argument. We conclude that, regardless of the subsequent enactment of SB 963 (2001), the MUPL funds were *received* from General Fund revenue sources * * * during the [1999-2001] biennium," ORS 291.349(4), and, consequently, had to be included in the "kicker" calculation. (Emphasis added.)

Plaintiffs' argument in that regard is straightforward: SB 963, regardless of its intent, may have authorized the transfer of the MUPL funds from the General Fund before the end of the biennium, but that transfer could not, and did not, transform the MUPL funds into something other than "revenues received from General Fund revenue sources" during the 1999-2001 biennium for purposes of ORS 291.349(4). Bluntly: Once "received," always "received."

The state responds that ORS 291.349(4) requires DAS to determine, at the end of the biennium, what General Fund revenues were received during the biennium and that if, "during the biennium, the legislature changes the nature of revenues received as it did in SB 963, those funds cannot be included in DAS's final calculation under this statute." That approach begs the question of whether, by enacting SB 963, the legislature did or could actually "change the nature" of the revenues received for purposes of the ORS 291.349(4) calculation.[5] The state's position depends on the premise that although MUPL funds expected to be received during the biennium were properly considered to be "General Fund * * * revenues that will be *received by* the state during the

_____

[5] The state does not contend, nor could it plausibly, that SB 963 purported to amend ORS 291.349(4) and, particularly, to alter its operation with respect to the calculation of the "kicker." Nothing in SB 963 refers to ORS 291.349, and there is no necessary inconsistency in the operation of the two statutes.

biennium" for purposes of the projection made at the beginning of the biennium as described in ORS 291.349(1), the MUPL funds actually received and deposited in the General Fund during the biennium were not "revenues *received from* General Fund revenue sources" for purposes of the calculation performed pursuant to ORS 291.349(4) at the end of the biennium. (Emphasis added.) Thus, stripped to its essence, the state's argument is that, while the MUPL funds were received as General Fund revenues during the 1999-2001 biennium, by the time the kicker was calculated, SB 963 had rendered them "unreceived."

We return, then, to ORS 291.349(4). In construing that provision—and, particularly, the critical term "revenues received from General Fund revenue sources"—we must view the statutory text in context, giving words of common usage their plain, natural, and ordinary meaning. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). We read the text in context in light of maxims of statutory construction that bear directly on the text. *See id.* (first level of statutory construction includes "rules of construction that bear directly on the interpretation of the statutory provision in context"). One such maxim is that, "[a]bsent any indication to the contrary, we assume that statutory terms have the same meaning throughout a statute." *Knapp v. City of North Bend*, 304 Or 34, 41, 741 P2d 505 (1987). Similarly, when a term is used consistently throughout numerous statutes in a manner indicating that the legislature intended the term to be given its plain meaning, that suggests that, whenever the legislature uses that term, it means the same thing. *See, e.g., State v. Holloway*, 138 Or App 260, 266-67, 908 P2d 324 (1995).

No provision of ORS chapter 291, or any other contextually relevant statute, defines "revenue." However, in common usage, "revenue," as used in this context, means "the annual or periodical yield of taxes, excises, customs, duties, and other sources of income that a nation, state, or municipality *collects and receives* into the treasury for public use: public income of whatever kind." *Webster's Third New Int'l Dictionary* 1942 (unabridged ed 1993) (emphasis added). In short, "revenues" are monies that have actually been collected and received by the government.

The term "General Fund" is used consistently throughout the Oregon statutes to refer to the fund into which monies are deposited pursuant to ORS 293.105 and ORS 293.110. For example, ORS 293.105 and ORS 293.110 describe the state General Fund and what monies the State Treasurer is required to place in the General Fund. Specifically, ORS 293.110 provides, in part:

> "(1)   All payments of money into the State Treasury by virtue of any statute providing for, creating, authorizing or continuing any of the funds and accounts enumerated in subsection (2) of this section shall be paid into and become a part of the General Fund.

> "(2)   The following funds and accounts shall be a part of the General Fund:

> "* * * * *

> "(h)   All other funds or accounts created by law that are specifically established in the law creating them as funds or accounts in the General Fund."

We thus conclude that General Fund revenues are monies collected and received by the state that are designated by law "to be paid into and become a part of the General Fund." ORS 293.110(1).[6]

Oregon Laws 1999, chapter 916, section 9(2), *see* 193 Or App at 217 n 4, embodied such a designation. That statute "specifically established in the law," ORS 293.110(2)(h), that MUPL funds received during the biennium beginning July 1, 1999, "shall be transferred to the General Fund." It is undisputed that the $113,249,821 at issue in this case was received during the biennium beginning July 1, 1999, and transferred to the General Fund while Oregon Laws 1999, chapter 916,

---

[6] We note that the term "General Fund revenues" *is* defined in ORS 291.348— a statute that requires DAS, in even-numbered years, to "ascertain the total of General Fund revenues obtained from all sources during the preceding fiscal year[.]" ORS 291.348(1). That definition provides that, as used in "this section," General Fund revenues are "all payments of money credited to the State Treasury that are placed or to be placed by the State Treasurer to the credit of the General Fund of the State of Oregon for general governmental purposes." ORS 291.248(3). That definition, of course, is not controlling here, because it specifically applies only to ORS 291.348. Nonetheless, we note that that definition is consistent with the plain meaning of the term General Fund revenues as we have construed it above.

section 9(2) was in effect. Thus, we conclude that the disputed MUPL funds were "paid into and bec[a]me a part of the General Fund." ORS 293.110(1).

Given that conclusion, it follows that DAS was required to (and, in fact, did) include in its estimate of General Fund revenues at the beginning of the 1999-2001 biennium the amount of MUPL funds that were estimated to be received during that biennium. ORS 291.349(1). The question, then, reduces to whether, by virtue of SB 963 (2001), funds that (a) were included in the General Fund revenue projection for purposes of ORS 291.349(1) and (b) were later received by the state and deposited into the General Fund during the biennium somehow became something *other than* "revenues received from General Fund revenue sources" for purposes of subsection (4) of the same statute.

We conclude that they did not. Subsection (4) itself establishes a necessary congruence between the estimated General Fund revenues described in subsection (1) and the revenues received from General Fund revenue sources described in subsection (4). Specifically, ORS 291.349(4) itself explicitly mandates a comparison of the amounts of "the revenues received from General Fund revenue sources" with "the amounts estimated to be received from such sources for the biennium." The terminology is congruent, and it is employed in the context of a statute that, essentially, prescribes a mathematical calculation. Nothing in the text or context of the statute suggests that the legislature, in enacting ORS 291.349(4), intended the components of that calculation to be *qualitatively*, as opposed to *quantitatively*, different.

In sum, at *PGE*'s first level, the only plausible reading of "revenues received from General Fund revenue sources" as used in ORS 291.349(4) is that that term refers to revenues actually received by the state that were required, under ORS 293.105 and ORS 293.110, to "be paid into and become part of the General Fund," ORS 293.110, and that DAS was required to include in its estimate under ORS 291.349(1). Accordingly, the transferred MUPL funds were "revenues received from General Fund revenue sources" for purposes of ORS 291.349(4).

Nothing in SB 963, and specifically the retroactivity provision of section (3) of SB 963, altered that reality. As noted, *see* 193 Or App at 218-19, section (1) of SB 963 required the creation of a MUPL account that is separate from the General Fund, while section (3) specified that the requirement that DAS transfer MUPL funds into the newly created account "applies to payments received by the department before the effective date of this 2001 Act." Section (3) thus required DAS to transfer MUPL funds that previously had been deposited into the General Fund pursuant to Oregon Laws 1999, chapter 916, section 9, out of the General Fund and into the newly created account. The requirement that the funds be transferred out of the General Fund, however, did not alter the fact that they were "paid into and bec[a]me part of the General Fund," ORS 293.110, at the time that they were deposited there pursuant to Oregon Laws 1999, chapter 916, section 9. Thus, regardless of the legislature's later disposition of those funds, they were "received from General Fund revenue sources," ORS 291.349(4), when they were properly placed in the General Fund pursuant to Oregon Laws 1999, chapter 916, section 9, and ORS 293.110 in the first instance. That the legislature redirected those funds elsewhere before the end of the biennium did not alter the practical and statutory reality that those revenues were *received* from a General Fund revenue source.[7]

We thus conclude that the trial court erred in denying plaintiffs' motion for summary judgment on the statutory issue described above, and consequently erred in granting defendant's motion for summary judgment and in denying its motion.

Reversed and remanded.

---

[7] In that regard, we again emphasize that SB 963 did not amend ORS 291.349 and, particularly ORS 291.349(4).