Argued and submitted January 11, decision of Court of Appeals reversed; judgment of circuit court affirmed February 17, 2005

Carol BOBO,
Perry Atkinson, Gary George,
Robert Fulton Ekstrom, Solomon Yue, Jr.,
June Hartley, and Jeffrey Grossman,
*Respondents on Review,*

*v.*

Theodore R. KULONGOSKI,
Laurie Warner, and the State of Oregon,
*Petitioners on Review.*

(CC 01C-15710; CA A120098; SC S51565)

107 P3d 18

Mary Williams, Solicitor General, Salem, argued the cause and filed the briefs for petitioners on review. With her on the briefs was Hardy Myers, Attorney General.

Gregory W. Byrne, Portland, argued the cause and filed the brief for respondents on review.

KISTLER, J.

**KISTLER, J.**

This case presents primarily two questions. The first is whether, by retroactively transferring Medicaid Upper Payment Limit Funds (Medicaid funds) out of the General Fund, Senate Bill (SB) 963 (2001) reduced the amount of money that the General Fund received for the 1999-2001 biennium and also the amount of a statutory tax refund, popularly known as the "kicker." The second is whether, if that were the effect of SB 963, the Oregon Constitution required that that bill originate in the House of Representatives and pass by a three-fifths vote. We hold that the legislature understood that SB 963 would result in reducing the kicker refund and that the legislature complied with the Oregon Constitution when it enacted SB 963.

Two statutes are relevant to resolving the questions that this case presents. The first is the kicker statute, ORS 291.349. As pertinent to this case, that statute requires the Department of Administrative Services (DAS) to make two determinations.[1] First, ORS 291.349(1) directs DAS to estimate at the beginning of each biennium the amount of General Fund revenues that the state will receive during that biennium. Second, ORS 291.349(2) directs DAS to determine at the end of the biennium the amount of General Fund revenues that the state actually received. ORS 291.349(4) provides that, "[i]f the revenues received from General Fund revenue sources * * * during the biennium" exceed the estimated revenues by two percent, then the state will refund "the total amount of that excess" to the taxpayers.

The second statute involves Medicaid funds that the state receives from the federal government. In 1999, the legislature directed the Department of Human Services to transfer any Medicaid funds that it received during the 1999-2001 biennium to the General Fund. Or Laws 1999, ch 916, § 9. Shortly before the end of the 1999-2001 biennium, the 2001 Legislative Assembly reconsidered and reversed that decision. The legislature passed a bill, SB 963, that established an account for Medicaid funds "separate and distinct

---

[1] ORS 291.349 is more complex than our description of it suggests. Those complexities, however, are not relevant to the issues that this case presents.

from the General Fund." Or Laws 2001, ch 405, § 1(1).[2] It directed the Department of Human Services to transfer any Medicaid funds received in the future to that account, Or Laws 2001, ch 405, § 1(2), and provided that the transfer requirement also "applies to payments received by the department before the effective date of this 2001 Act," Or Laws 2001, ch 405, § 3. As explained below, the legislature understood that, by retroactively taking the Medicaid funds out of the General Fund and transferring them to a new account, it would reduce both the amount of money that the General Fund received during the 1999-2001 biennium and also the amount of the kicker refund.

Following the passage of SB 963, DAS excluded the Medicaid funds in calculating the kicker; that is, DAS did not include the Medicaid funds that the state had received in the 1999-2001 biennium in determining the amount of General Fund revenues received during the biennium. Excluding the Medicaid funds reduced the amount of General Fund revenues received by approximately $113,249,821 and resulted in a corresponding reduction in the amount of General Fund money returned to the taxpayers as part of the 2001 kicker refund.[3]

Plaintiffs filed this declaratory judgment action against the Governor, the director of DAS, and the State of Oregon (collectively "the state"). Plaintiffs asked the court to declare that, because SB 963 was a "bill for raising revenue," Article IV, section 18, of the Oregon Constitution required that the bill originate in the House of Representatives, and Article IV, section 25(2), of the Oregon Constitution required that it pass each house by a three-fifths vote. Plaintiffs also sought a declaration that SB 963 embraced more than one subject in violation of Article IV, section 20, of the Oregon Constitution. Finally, plaintiffs sought a declaration that,

---

[2] Legislative counsel did not publish in the Oregon Revised Statutes the section of SB 963 that bears on this case. *See* ORS 440.420 (codifying only first section of SB 963). For ease of reference, we refer to this law by its bill title rather than by the part of the law that legislative counsel codified.

[3] After DAS excluded the Medicaid funds, the General Fund revenues still exceeded the estimated revenues by two percent. Accordingly, the taxpayers received a kicker refund although it was smaller than the refund they otherwise would have received.

notwithstanding SB 963, ORS 291.349 required that Medicaid funds received before the effective date of SB 963 be included in the kicker refund.[4]

On cross-motions for summary judgment, the trial court ruled in the state's favor and entered judgment accordingly. The Court of Appeals reversed. *Bobo v. Kitzhaber*, 193 Or App 214, 225, 89 P3d 1189 (2004).[5] The court observed that ORS 291.349(4) provides that, in calculating the kicker, the state shall deduct the estimated General Fund revenue from the "revenues received from General Fund revenue sources * * * during the biennium." *Id.* at 221. The court reasoned that the fact that SB 963 transferred the Medicaid funds from the General Fund to another fund did not mean that the General Fund had not received those funds within the meaning of ORS 291.349(4).[6] *Id.* at 224. It followed, the Court of Appeals concluded, that ORS 291.349(4) required DAS to include the Medicaid funds in calculating the 2001 kicker refund.

On review, the parties analyze the statutory question differently. The state focuses, as the Court of Appeals did, on ORS 291.349. It argues that the Court of Appeals erred in holding that, if the Medicaid funds were General Fund revenues when the state received them, then they were "received" for the purposes of ORS 291.349(4). In the state's view, ORS 291.349(2) permits DAS, in calculating the amount of revenues that the General Fund received during the biennium, to make appropriate adjustments for funds that, as the legislature determined in SB 963, the General Fund never should have received.

---

[4] Plaintiffs do not dispute that the legislature could put the Medicaid funds in a separate account prospectively. All their arguments focus instead on the retroactive transfer of Medicaid funds from the General Fund and the effect of that transfer on the 2001 kicker refund.

[5] John Kitzhaber was Governor of Oregon when this action commenced. Theodore Kulongoski now holds the office and was automatically substituted pursuant to ORCP 34 F(1) (providing for automatic substitution of public officer's successor) and ORAP 8.05(1) (adopting ORCP 34).

[6] The court noted the possibility that SB 963 might modify the operation of ORS 291.349, but explained that the state had not made that argument. *Bobo*, 193 Or App at 221 n 5.

Plaintiffs respond that the Court of Appeals interpreted ORS 291.349 correctly. They also argue, however, that the legislature enacted SB 963 for the purpose of removing the Medicaid funds from the 2001 kicker refund. Plaintiffs' second argument is at odds with their first. If their interpretation of SB 963 is correct, then the legislature's later more specific intent—to take the Medicaid funds out of the kicker refund—controls over any contrary intent in ORS 291.349. *See* ORS 174.020(2) (when statutes conflict, more specific statute controls); *State v. Dahl*, 336 Or 481, 489, 87 P3d 650 (2004) (same). Perhaps for that reason, plaintiffs focus on review primarily on their constitutional claims. They contend that SB 963 violates the Oregon Constitution because it is a "bill for raising revenue" that had to originate in the House and pass both houses by a three-fifths vote.[7]

■ We begin with the parties' statutory arguments. Specifically, we consider whether the legislature intended that, by retroactively transferring Medicaid funds out of the General Fund, SB 963 would affect the operation of ORS 291.349.[8] In determining the legislature's intent, we look initially to the text and context of SB 963. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993) (stating statutory construction methodology). The text of SB 963 provides:

"*SECTION 1.* (1) The Medicaid Upper Payment Limit Account is established in the State Treasury separate and distinct from the General Fund. Moneys in the account are continuously appropriated to the Oregon Department of Administrative Services for health-related programs.

---

[7] Although the voters added the "kicker" to the Oregon Constitution in 2000, plaintiffs do not contend that that constitutional provision applies here. *See* Or Const, Art IX, § 14(7)(c) (stating that Article IX, section 14, does not apply "[t]o biennia beginning before July 1, 2001").

[8] As the Court of Appeals noted, the state did not advance this argument in the Court of Appeals. The state, however, has relied on SB 963 throughout this litigation, and plaintiffs have argued that the legislature enacted SB 963 to remove the Medicaid funds from the kicker. In these circumstances, the meaning of SB 963 and its effect on ORS 291.349 are properly before us. *See Miller v. Water Wonderland Improvement District*, 326 Or 306, 309 n 3, 951 P2d 720 (1998) (basing decision on statute that respondent invoked even though petitioners had brought their claim under related but different statute).

"(2)    The Department of Human Services shall transfer to the Medicaid Upper Payment Limit Account that portion of the payment received by the department from health districts in this state [under the state Medicaid Plan and under certain intergovernmental agreements].

"*SECTION 2.*    Section 9, chapter 916, Oregon Laws 1999, is repealed.

"*SECTION 3.*    The requirement established by section 1(2) of this 2001 Act, that the Department of Human Services transfer described payments to the Medicaid Upper Limit Payment Account, applies to payments received by the department before the effective date of this 2001 Act, as well as to payments received on or after the effective date of this 2001 Act.

"*SECTION 4.*    This 2001 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2001 Act takes effect on June 30, 2001."

Or Laws 2001, ch 405.

The text of SB 963 does not refer specifically to ORS 291.349. However, section 3 of the bill retroactively transfers the Medicaid funds from the General Fund to a separate account. That section reflects an explicit legislative intent to treat the Medicaid funds as if the General Fund had not received those funds during the 1999-2001 biennium. By reducing the amount of funds that the General Fund received during the 1999-2001 biennium, SB 963 also reduced the amount of money included in the 2001 kicker refund. *See* ORS 291.349(4) (describing effect of reducing General Fund revenues on kicker refund). That much is clear from the text of SB 963 and ORS 291.349.

We note that the effect of SB 963 was not lost on the legislature. The Joint Committee on Ways and Means introduced SB 963 at the end of the 2001 legislative session, and the Senate President referred the bill back to Ways and Means for a hearing. House and Senate Journal S-170 (2001). Senator Hannon, one of the co-chairs of Ways and Means, explained both the reason for the bill and its effect. Tape Recording, Joint Committee on Ways and Means, SB 963, May 31, 2001, Tape 524, Side A. He told the committee that,

in his view, the 1999 legislature mistakenly had directed the Department of Human Services to transfer Medicaid funds, which the federal government had earmarked for health related uses, into the General Fund. *Id.* Senator Hannon explained that SB 963 corrected that error prospectively and also retroactively by transferring the Medicaid funds that mistakenly had been placed in the General Fund into a newly established, separate fund. *Id.*

Senator Hannon was clear about the effect of the retroactive transfer: It would reduce the kicker refund. *Id.* He told the committee:

> "By redirecting the [Medicaid] funds from the general fund to a separate account, the bill allows funds that would be part of the 2001-03 General Fund kicker refund to be available for expenditure during the 2001-03 biennium."

*Id.* During the ensuing debate, no one questioned that retroactively correcting the decision to commingle the Medicaid funds with General Fund money would reduce the 2001 kicker refund; rather, they debated the propriety of that result. *Id.*

The members of the House also understood that retroactively transferring the Medicaid funds out of the General Fund would reduce the 2001 kicker refund. Many of the House members submitted contemporaneous explanations for their vote on the bill. *See* Joint Committee on Ways and Means, SB 963, Bill File (compiling vote explanations). Representative Backlund's explanation is typical. He stated:

> "I justify my vote on SB 963 by pointing out to the people that the kicker was not intended to include federal Medicaid money. The federal Medicaid money was incorrectly placed in the General Fund at the very end of the 1999 session and was never intended to be part of the kicker fund."

Similarly, Representative Bates explained that "[o]ur revenues were artificially inflated by federal funds being erroneously placed in the General Fund which in turn artificially elevated the kicker." He reasoned that, as a result of SB 963, "the kicker will be based on taxes collected in Oregon and not on revenues falsely inflated with federal Medicaid dollars."

The legislature understood that retroactively transferring the Medicaid funds from the General Fund to a separate account would reduce both the amount of the General Fund revenues received during the 1999-2001 biennium and also the amount of the 2001 kicker refund. Given that legislative intent, we need not decide whether the Court of Appeals or the state's interpretation of ORS 291.349 is correct. Even if the Court of Appeals correctly concluded that ORS 291.349 otherwise would require that, in calculating the kicker refund, DAS include all monies that the General Fund had received, SB 963 reflects a different intent regarding one specific source of funds—*viz.*, the Medicaid funds. That later, more specific legislative intent controls. *See* ORS 174.020(2) (when statutes conflict, more specific statute controls); *Dahl*, 336 Or at 489 (same). As a matter of statute, DAS correctly excluded the Medicaid funds in calculating the kicker refund.[9]

■ Having concluded that SB 963 excluded the Medicaid funds from the calculation of the 2001 kicker refund, we turn to plaintiffs' constitutional arguments. They argue that SB 963 violates the Oregon Constitution because it is a "bill[ ] for raising revenue" that either had to originate in the House or pass both houses by a three-fifths vote. *See* Or Const, Art IV, § 18 (requiring that bills for raising revenue originate in House); Or Const, Art IV, § 25(2) (requiring that bills for raising revenue pass each house by three-fifths vote). Although plaintiffs' Article IV, section 18, and Article IV, section 25, arguments raise similar issues, we consider them separately.

■ Article IV, section 18, provides that "bills for raising revenue shall originate in the House of Representatives." Because SB 963 did not originate in the House, plaintiff's first constitutional challenge reduces to the question whether SB 963 is a "bill[ ] for raising revenue." In determining what that phrase means, we consider its "specific wording, the case

---

[9] Plaintiffs argue that DAS should have deducted the Medicaid funds from the estimated as well as the actual revenues that the General Fund received for the 1999-2001 biennium. Whatever the merits of that argument as an accounting matter, the legislature was not required to adopt it, and the legislative history reveals that the legislature understood that, in calculating the kicker, DAS would exclude the Medicaid funds only from the revenues that the General Fund received.

law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).

We begin with the terms "raise" and "revenue." Article IV, section 18, was part of the original Oregon Constitution. To the framers of the constitution, the word "raise" would have meant, in this context:

> "[t]o collect; to obtain; to bring into a sum or fund. Government *raises* money by taxes, excise and imposts."

Noah Webster, *An American Dictionary of the English Language* (unpaginated) (1828) (emphasis in original); *see Vannatta v. Keisling*, 324 Or 514, 530, 931 P2d 770 (1997) (referring to dictionary relevant to time constitutional provision adopted to determine word's meaning). Similarly, the word "revenue" would have meant, in this context:

> "[t]he annual produce of taxes, excise, customs, duties, rents, &c. which a nation or state collects and receives into the treasury for public use."

*Id.*

We draw two tentative conclusions from those terms. First, a bill will "raise" revenue only if it "collects" or "brings in" money to the treasury. Second, not every bill that collects or brings in money to the treasury is a "bill[ ] for raising revenue." Rather, the definition of "revenue" suggests that the framers had a specific type of bill in mind—bills to levy taxes and similar exactions.

The constitutional requirement that bills for raising revenue originate in the House of Representatives has a long history. *See Dale v. Kulongoski*, 322 Or 240, 242-43, 905 P2d 844 (1995) (tracing history). The requirement finds its roots in the practices of the British Parliament, and comparable provisions appeared in both the federal constitution and various state constitutions before Oregon adopted its constitution. *Id.* at 242-43 and n 1; *see* Joseph Story, *Commentaries on the Constitution of the United States* 338-39 (1833) (tracing sources of federal constitutional provision). The requirement consistently has reflected a belief that the branch of government closest to the people "will be more watchful and

cautious in the imposition of taxes" and thus should be the source of those bills. Story, *Commentaries on the Constitution* at 341.[10]

By the time that Oregon adopted its constitution, the phrase "bills for raising revenue" had acquired an accepted meaning. In his commentaries on the constitution, Story observed that, although every bill that directly or indirectly raises revenue theoretically could be called a bill for raising revenue, "the practical construction of the constitution has been against [t]his opinion." *Id.* at 343. He explained:

> "[T]he history of the origin of the power, already suggested, abundantly proves, that it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes, which may incidentally create revenue. No one supposes, that a bill to sell any of the public lands, or sell public stock, is a bill to raise revenue, in the sense of the constitution. Much less would a bill be so deemed, which merely regulated the value of foreign or domestic coins, or authorized a discharge of insolvent debtors upon assignments of their estates to the United States, giving a priority of payment to the United States in case of insolvency, although all of them might incidently bring revenue into the treasury."

*Id.* (footnotes omitted).[11]

This court has interpreted Article IV, section 18, consistently with its text and history. For example, in *Northern Counties Trust v. Sears*, 30 Or 388, 401-03, 41 P 931 (1895), the question was whether a law that imposed a fee for a service was a "bill[ ] for raising revenue." After tracing the history

---

[10] In Britain, the requirement that bills imposing taxes originate in the House of Commons reflected a concern that the House of Lords would be more responsive to the King than the people. Story, *Commentaries on the Constitution* at 339. Although that concern was absent in the United States, the framers of the federal constitution viewed the House of Representatives as more responsive to the people and thus the body in which tax bills should originate. *Id.* at 340. That view presumably derived from the fact that, at least initially, each state's legislature chose that state's senators while the people elected their representatives directly. US Const, Art I, §§ 2, 3.

[11] Although Story was describing the history of the federal constitutional provision, the court has recognized that that history also informs the meaning of Article IV, section 18. *Dale*, 322 Or at 242-43 and n 1; *accord Northern Counties Trust v. Sears*, 30 Or 388, 403, 41 P 931 (1895).

of the constitutional provision and examining the cases interpreting its federal counterpart, the court concluded that not every statute that brought money into the treasury was a "bill[ ] for raising revenue" within the meaning of Article IV, section 18. *Id.* at 403. Rather, as the court explained,

"[a] law which requires a fee to be paid to an officer, and finally covered [*sic*] into the treasury of a county, for which the party paying the fee receives some equivalent in return, other than the benefit of good government, which is enjoyed by the whole community, and which the party may pay and obtain the benefits under the law, or let it alone, as he [or she] chooses, does not come within the category of an act for raising revenue[.]"

*Id.*

■■ Considering the wording of Article IV, section 18, its history, and the case law surrounding it, we conclude that the question whether a bill is a "bill[ ] for raising revenue" entails two issues. The first is whether the bill collects or brings money into the treasury. If it does not, that is the end of the inquiry. If a bill does bring money into the treasury, the remaining question is whether the bill possesses the essential features of a bill levying a tax. *See Northern Counties Trust*, 30 Or at 402 (stating test). As *Northern Counties Trust* makes clear, bills that assess a fee for a specific purpose are not "bills for raising revenue" even though they collect or bring money into the treasury.

In this case, plaintiffs' claim fails the initial inquiry. Section 3 of SB 963 does not collect or bring any money into the treasury; it does not impose a new tax, increase an existing one, or even impose a fee for a service. Rather, section 3 transfers funds already in hand from one program (a tax refund) to another set of programs (expenditures for health related purposes). A bill that allocates existing monies among different programs does not "raise" revenue within the meaning of Article IV, section 18, and did not have to originate in the House of Representatives.

■ Our conclusion that SB 963 does not violate Article IV, section 18, also answers plaintiffs' claim that SB 963 violates Article IV, section 25(2). That subsection provides that "[t]hree-fifths of all members elected to each House shall be

necessary to pass bills for raising revenue." The people added subsection (2) to Article IV, section 25, in 1996, following a legislative referral, and nothing in the text or context of that subsection suggests that the phrase "bills for raising revenue" in Article IV, section 25(2) has a different meaning than it has in Article IV, section 18. *See Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 57, 11 P3d 228 (2000) (looking initially to text and context when interpreting legislatively referred constitutional amendments). Indeed, the court has recognized that the phrase has the same meaning in both sections. *See Dale*, 322 Or at 242-43 (looking to cases interpreting Article IV, section 18, to determine meaning of phrase in Article IV, section 25(2)). It follows that SB 963 did not need to receive three-fifths of the vote in each house. A majority sufficed.[12]

Having considered plaintiffs' statutory and constitutional arguments, we hold that the legislature understood that, by enacting SB 963, it would transfer Medicaid funds from the General Fund and also reduce the 2001 kicker refund. It follows that, as a matter of statute, DAS correctly excluded those funds from General Fund revenues in calculating the kicker. We also hold that, in enacting SB 963, the legislature complied with Article IV, sections 18, 20, and 25, of the Oregon Constitution.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

---

[12] Plaintiffs also argue that SB 963 contains more than one subject in violation of Article IV, section 20, of the Oregon Constitution. However, all of the provisions in SB 963 focus on a single subject—the proper accounting for past and future Medicaid funds. The fact that the legislature understood that SB 963 would affect the kicker refund does not mean that the bill embraces more than one subject. *See State v. Fugate*, 332 Or 195, 205, 26 P3d 802 (2001) (reasoning that fact that act has more than one purpose does not mean that it embraces more than one subject).