Argued and submitted January 7, decision of Court of Appeals reversed;
judgment of circuit court affirmed August 11, 2005

## COAST RANGE CONIFERS, LLC,
### an Oregon Limited Liability Company,
*Respondent on Review,*

*v.*

## STATE OF OREGON,
### by and through the Oregon State Board of Forestry,
*Petitioner on Review.*

(CC 011423; A117769; SC S51342)

117 P3d 990

Denise Fjordbeck, Assistant Attorney General, Salem, argued the cause for petitioner on review. With her on the

briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Phillip D. Chadsey, of Stoel Rives LLP, Portland, argued the cause and filed the brief for respondent on review.

Edward J. Sullivan, of Garvey Schubert Barer, Portland, filed the brief for *amici curiae* 1000 Friends of Oregon, The American Planning Association, and its Oregon Chapter.

Gary K. Kahn, of Reeves, Kahn & Hennessy, Portland, filed the briefs for *amicus curiae* City of West Linn.

Margaret S. Olney, of Smith, Diamond & Olney, Portland, filed the brief for *amicus curiae* Oregon AFL-CIO.

Jeffrey B. Litwak, White Salmon, Washington, filed the brief for *amicus curiae* Columbia River Gorge Commission.

Bart A. Brush, Portland, and Nathan Baker, Portland, filed the briefs for *amici curiae* Audubon Society of Portland, Friends of the Columbia Gorge, Inc., Institute for Fisheries Resources, League of Women Voters of Oregon, Pacific Coast Federal of Fishermen's Associations, and Oregon Trout, Inc. With them on the briefs was John D. Echeverria, Washington, D.C.

Christy K. Monson, Salem, filed the briefs for *amici curiae* League of Oregon Cities, Multnomah County, National League of Cities, and International Municipal Lawyers Association. With her on the briefs was Timothy J. Dowling, Washington, D.C.

Michael G. Neff, of Haglund Kelley Horngren & Jones LLP, Portland, filed the brief for *amici curiae* Neil Westfall, SDS Co. LLC, and Senate President Pro Tem Ted Ferrioli.

James S. Burling, of Pacific Legal Foundation, Sacramento, California, and John M. Groen, of Groen Stephens & Klinge, LLP, Bellevue, Washington, filed the brief for *amicus curiae* Pacific Legal Foundation.

KISTLER, J.

## KISTLER, J.

A state wildlife regulation prevents plaintiff from logging approximately nine acres of a 40-acre parcel that it owns. Plaintiff brought this action claiming that the regulation amounted to a "taking" of its property without just compensation in violation of the state and federal constitutions. The Court of Appeals agreed with plaintiff. It reasoned that, in determining whether the regulation deprived plaintiff of all economically beneficial use of the property and thus took the property, it should focus on the nine-acre parcel that the regulation affected rather than the 40-acre parcel that plaintiff owns. *Coast Range Conifers v. Board of Forestry*, 189 Or App 531, 550, 76 P3d 1148 (2003), *adh'd to on recons*, 192 Or App 126, 83 P3d 966 (2004). Because the regulation deprived plaintiff of all economically viable use of the nine acres, the Court of Appeals held that the state had taken that part of plaintiff's property in violation of the state constitution. *Id.* We hold that the correct test is more comprehensive than the Court of Appeals perceived and that, under the correct test, the state did not take plaintiff's property under either the state or the federal constitution.

Plaintiff is a limited liability company in the business of logging timber. In 1996, plaintiff acquired a 40-acre parcel of timber in the Coast Range as part of a land exchange with the United States Forest Service. On May 1, 1998, an employee of the Oregon Department of Fish and Wildlife saw two adult bald eagles at a nest within the 40-acre tract. A month later, an employee of the United States Fish and Wildlife Service observed the nest from a helicopter.

Because bald eagles are listed as a threatened species under the Endangered Species Act, 16 USC § 1533 (2000), state regulations required plaintiff to file a written plan with the State Forester before engaging in any logging activities that might damage the nest site. *See* OAR 629-605-0170(1)(d) (State Forester approval required to log within 300 feet of protected species' nesting site); OAR 629-665-0020 (State Forester approval of written plan required before undertaking forest practice that conflicts with resource site);

OAR 629-665-0220(1) (bald eagle resource site includes active nest tree). On July 31, 1998, plaintiff submitted a plan to log within 330 feet of the bald eagle nest site. The State Forester rejected that plan because, in the State Forester's view, the plan did not provide the site with sufficient protection. The State Forester recommended that plaintiff modify its plan to provide, among other things, a 400-foot buffer of standing trees (approximately nine acres) around the nest. On August 26, 1998, plaintiff submitted a modified plan that incorporated the State Forester's recommendations and the State Forester approved the plan.

By September 1998, plaintiff had logged approximately 31 of the 40 acres in a manner consistent with the modified plan. One month later, following the end of the bald eagle nesting season, plaintiff submitted a new plan to log the remaining nine acres. The State Forester denied that plan because he found, among other things, that the area was an active resource site, that bald eagles were likely to use the nest site in the future, and that plaintiff's plan failed to provide any protection for the nesting site. Plaintiff sought a contested case hearing. After that hearing, the Board of Forestry issued a final order upholding the State Forester's ruling.

Plaintiff then filed this action against the State of Oregon and Board of Forestry (collectively the "state"), alleging that the state's refusal to let it log the remaining nine acres took that property in violation of Article I, section 18, of the Oregon Constitution and the Fifth Amendment to the United States Constitution.[1] Plaintiff filed a motion for partial summary judgment, and the state filed a cross-motion for summary judgment. In support of its motion, plaintiff submitted an affidavit stating that "[t]he Subject Timber [on the nine-acre tract] has no economic value unless it can be logged." The state did not dispute that statement in its response. Rather, it argued that, in determining whether the

---

[1] Article I, section 18, of the Oregon Constitution provides, in part:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation."

The Takings Clause of the Fifth Amendment to the United States Constitution provides, "nor shall private property be taken for public use, without just compensation."

regulation deprived plaintiff of all economically viable use of its property, the proper focus was the 40-acre parcel that plaintiff had acquired in the land exchange. The state contended that the fact that the regulation prevented plaintiff from using part of its property did not mean that the property, as a whole, had no economically viable use.[2]

The trial court agreed with the state, granted its summary judgment motion, and denied plaintiff's motion for partial summary judgment. The Court of Appeals reversed. The court began by recognizing that, under the federal constitution, the United States Supreme Court has applied the "whole parcel rule" in determining whether a regulation denies an owner any economically beneficial use of his or her property; that is, under the federal constitution, a court does not " 'divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.' " *Coast Range Conifers,* 189 Or App at 546 (quoting *Penn Central Transp. Co. v. New York City,* 438 US 104, 130-31, 98 S Ct 2646, 57 L Ed 2d 631 (1978)).

Citing two of this court's cases, the Court of Appeals concluded that this court had "effectively rejected" the whole parcel rule under the state constitution. *Id.* at 546-49. The Court of Appeals noted that, in determining whether a regulation effected a taking, this court had focused on the owner's ability to use the part of the property that the regulation affected; it had not focused on the owner's ability to use the property as a whole. *Id.* at 547-49. Following that perceived lead, the Court of Appeals held that, because plaintiff did not have any economically viable use of the nine acres affected by the wildlife regulation, the state had taken that part of plaintiff's property in violation of Article I, section 18, of the Oregon Constitution. *Id.* at 550. We allowed the state's petition for review and now reverse.

On review, the state argues that Article I, section 18, does not apply to regulations that merely limit the uses to which property may be put and that, if it does, we should look at the 40-acre parcel that plaintiff acquired rather than the

---

[2] The state also raised certain procedural defenses that it no longer pursues.

nine acres of timber that the regulation affects in determining whether the regulation takes plaintiff's property.

Plaintiff raises two state constitutional arguments in response.[3] Initially, it advances a unified theory of state takings law that attempts to draw a single set of principles from the separate strands of this court's takings cases. Alternatively, plaintiff argues that this court implicitly has rejected the whole parcel rule and urges us to determine whether a taking occurred by looking only at the specific property interest that the regulation affects. Plaintiff also advances a series of arguments under the federal Takings Clause.

■■ We begin with the state's argument that Article I, section 18, applies only to physical appropriations of property and has no application to regulations that limit the uses to which an owner may put his or her property. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (addressing state constitutional claims first). In analyzing that argument, we consider the text of Article I, section 18, its history, and the cases interpreting it. *See Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992) (stating methodology). Our goal in undertaking that inquiry is to identify the historical principles embodied in the constitutional text and to apply those principles faithfully to modern circumstances. *State v. Rogers*, 330 Or 282, 297, 4 P3d 1261 (2000).

Article I, section 18, provides, in part: "Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation." Because Article I, section 18, was part of the original Oregon Constitution, we look to the meaning of the words that the framers used. *See Bobo v. Kulongoski*, 338 Or 111, 120, 107 P3d 18 (2005) (looking to dictionary relevant to time constitutional provision adopted). In 1857, the word "take" meant "[i]n *a general sense*, to get hold or gain possession of a thing in almost any manner." Noah Webster, *An American Dictionary of the English Language* (1828) (emphasis in original).[4] That definition implies that governmental acts that

---

[3] Plaintiff does not argue that Oregon Laws 2005, chapter 1, popularly known as Measure 37, applies in this case, and we express no opinion on the application and meaning of that statute.

[4] The more specific definitions of "take" that Webster listed do not apply in this context.

result in the appropriation of private property for public use will constitute a taking—a conclusion that is consistent with the corollary prohibition in Article I, section 18, against demanding or appropriating the uncompensated services of any person. Webster defined "property" in 1828 both concretely (as "[a]n estate, whether in lands, goods or money") and more abstractly (as "[t]he exclusive right of possessing, enjoying and disposing of a thing"). *Id.* Put differently, the dictionary definition of property in 1828 was broad enough to include both the tangible or physical thing and the legal interests pertaining to it.

The history of Article I, section 18, sheds more light on its meaning.[5] Before the adoption of the federal Takings Clause, only two state constitutions guaranteed compensation for a taking. William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum L Rev 782, 790-91 (1995). The Vermont Constitution of 1777 required compensation "whenever any particular man's property is taken for the use of the public"— a requirement that most likely stemmed from the New York colonial government's refusal to recognize earlier land grants when England transferred control of the Vermont territory from New Hampshire to New York. *Id.* at 828-29.[6] Worded somewhat differently, Article X of the Massachusetts Constitution of 1780 required compensation "whenever the public exigencies require that the property of any individual should be appropriated to public uses"—a guarantee that Treanor suggests stemmed from uncompensated wartime appropriations. *Id.* at 830-34.[7]

As a general rule, however, the state constitutions that preceded the federal Bill of Rights did not guarantee

---

[5] No record of the framers' specific intent is available. The framers did not debate the decision to include Article I, section 18, in the Oregon Constitution, or at least no record of any debate exists. *See* Claudia Burton & Andrew Grade, *A Legislative History of the Oregon Constitution of 1857*, 37 Willamette L Rev 469, 530 (2001) (identifying that no record of any discussion of Article I, section 18, exists).

[6] The preamble to the proposed 1777 Vermont Constitution recited that "the late Lieutenant Governor Colden, of New York, with others, did * * * covet those very lands; and * * * obtained jurisdiction of those very identical lands ex parte; which ever was, and is, disagreeable to the inhabitants [of this state]." Treanor, 95 Colum L Rev at 828.

[7] The Northwest Ordinance of 1787 contained a similar provision. 95 Colum L Rev at 831-32.

compensation for any form of taking. Rather, legislatures typically provided for compensation in the bills that appropriated private property for public use, although the practice was not universal. Treanor, 95 Colum L Rev at 786-87. Some commentators reason that this legislative practice reflected the view that compensation for the taking of private property was a natural right. *See* Kris W. Kobach, *The Origins of Regulatory Takings: Setting the Record Straight*, 1996 Utah L Rev 1211, 1230-31 (1996) (so stating). Others discount the general acceptance of that view before Congress proposed, and the states ratified, the federal Bill of Rights. William Michael Treanor, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 Yale LJ 694, 714-16 (1985). They recognize, however, that the Fifth Amendment provided a model for later state constitutions and that, whatever its initial status, the "right [to compensation soon] came to seem an important and long honored part of the Anglo-American legal tradition." *Id.* at 715.[8]

The United States Supreme Court had few occasions to interpret the Takings Clause of the Fifth Amendment before Oregon adopted its constitution, and none of those decisions sheds any particular light on the issue presented here. The states, however, had greater opportunity to interpret their own takings clauses. Most state court decisions involved physical appropriation of property and typically resulted in the transfer of title. *See* William B. Stoebuck, *Nontrespassory Takings in Eminent Domain* 16-18 (1977) (summarizing early state takings cases). An emerging line of cases, however, recognized that the government could "take" a person's land even though it did not acquire title to the land. *See* Kobach, 1996 Utah L Rev at 1234-59 (identifying state cases). By 1868, Cooley explained, in commenting on a flooding case, that "any injury to the property of an individual which deprives the owner of the ordinary use of it is equivalent to a taking, and entitles him to compensation." Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 544 (1868).[9]

---

[8] Indeed, by 1833, Joseph Story was able to state that the Fifth Amendment's takings clause represented "an affirmance of a great doctrine established by common law for the protection of private property." Joseph Story, 3 *Commentaries on the Constitution of the United States* 661 (1833).

[9] Cooley distinguished between governmental actions that indirectly affect the value of land and do not constitute a taking and those actions that directly affect

The Oregon cases interpreting Article I, section 18, have followed that pattern. They have recognized that a "classic" taking occurs when the government physically occupies or appropriates property. They also have recognized, however, that Article I, section 18, is not limited to that paradigm; it applies as well to actions that are equivalent to a taking. Approximately 30 years after the adoption of the Oregon Constitution, this court held that the government took private property within the meaning of Article I, section 18, when it placed a railway in a public street, denying the property owner access to the street. *McQuaid v. Portland & V. R'y Co.*, 18 Or 237 (1889); *accord Iron Works v. O.R. & N. Co.*, 26 Or 224, 228-29, 37 P 1016 (1894) (explaining and applying *McQuaid*). The court based that holding on the theory that the owner had a right of access that the railway obstructed even though the government did not physically invade or occupy the owner's property. *McQuaid*, 18 Or at 247-48, 252.

Similarly, this court has held that government takes property when it intentionally floods private property, *Morrison v. Clackamas County*, 141 Or 564, 18 P2d 814 (1933), and when government-authorized overflights deny an owner the use and enjoyment of his or her property, even in the absence of a trespass, *Thornburg v. Port of Portland*, 233 Or 178, 192, 376 P2d 100 (1962). Additionally, the court has recognized that regulations that deny an owner the ability to put his or her property to any economically viable use will result in a taking and entitle the owner to compensation. *Boise Cascade Corp. v. Board of Forestry*, 325 Or 185, 198, 935 P2d 411 (1997); *see Dodd v. Hood River County*, 317 Or 172, 182, 855 P2d 608 (1993) (phrasing test as whether property retains "some substantial beneficial use").

It may be, as the state argues, that, when the framers adopted the Oregon Constitution, they did not consider the possibility that overflights or regulations could become so burdensome that they could constitute a taking. As Cooley makes clear, however, the framers would have been aware that governmental actions that did not fit precisely within the classic paradigm of a taking still could be "equivalent to a

---

land and are equivalent to a taking even though they do not result in the transfer of title. Cooley, *A Treatise on the Constitutional Limitations* at 541-48.

taking" and thus entitle the owner to compensation. Following that principle, this court has held that physically invasive actions, overflights, and regulations can rise to the level of a taking. Those decisions do not depart from the principle that underlies Article I, section 18; rather, they faithfully apply that principle to modern circumstances as they arise. *See Rogers*, 332 Or at 297 (stating test). Having considered the wording, history, and case law surrounding Article I, section 18, we adhere to our decisions and reject the state's argument that Article I, section 18, applies only to physical appropriation of property.

We turn to plaintiff's state constitutional arguments. As noted, plaintiff advances a unified theory of takings law that attempts to draw a single set of principles from the separate strands of this court's taking cases. As we understand plaintiff's argument, it would not distinguish between cases in which the state physically invades a person's land and cases in which the state regulates the use of that land. Rather, plaintiff argues that government actions taken to advance the public interest, regulatory or otherwise, unconstitutionally take a person's property if they substantially interfere with the use of that property.[10]

Plaintiff's unified theory is difficult to square with settled case law. This court consistently has distinguished among takings claims depending on the nature of the government action that gives rise to the claim and has applied different tests to different categories of government action. For example, when the government intentionally has authorized a physical invasion of private property, the court has asked whether the invasion substantially interfered with the owner's use and enjoyment of that property. *See Vokoun v. City of Lake Oswego*, 335 Or 19, 26, 56 P3d 396 (2002) (applying that test to claim that government intentionally diverted water onto private property); *Morrison*, 141 Or at 568-69 (same).[11] By contrast, when government regulates the use of

---

[10] Plaintiff would recognize some exceptions to its proposed rule. It would distinguish between cases in which the government is acting in its enterprise capacity rather than its arbitral capacity. It also would distinguish between cases depending on whether the regulatory burden falls unevenly on some landowners.

[11] The court also has applied this test to some governmentally authorized nuisances. *See Thornburg*, 233 Or at 192 (recognizing that overflights could

land to advance a public policy, this court has held that no taking occurs as long as the property retains some economically viable use. *Boise Cascade Corp.*, 325 Or at 198; *Dodd*, 317 Or at 182.[12]

■       Plaintiff would have us blur, if not obliterate, those well-established distinctions and apply the same legal test to governmental regulations that the court has applied to physical invasions of land. Plaintiff's proposed rule fails to take into account the different character of regulatory action. As the court concluded in *Suess Builders v. City of Beaverton*, 294 Or 254, 259, 656 P2d 306 (1982), and reaffirmed in *Dodd*, 317 Or at 182 n 12, "[r]egulation in pursuit of a public policy is not equivalent to taking for a public use, even if the regulated property is land." To be sure, government may exercise regulatory authority in a way that is tantamount to a public appropriation of private property. *Suess Builders*, 294 Or at 259 n 5. But, for the purposes of Article I, section 18, we decline to treat regulation of property and physical invasion of property as if they were the same.

        Plaintiff advances an alternative state constitutional argument. It contends that, in determining whether the property retains any economically viable use, we should consider only the property interest that the regulation affects. Put in the context of this case, plaintiff argues that, in determining whether its property has any economically viable use, we should consider only the nine acres of timber surrounding the bald eagle nest. Plaintiff contends that this court followed that approach in *Boise Cascade Corp.* and *Suess Builders* and thus has rejected, at least implicitly, the whole parcel rule.

        Plaintiff's reliance on *Suess Builders* is misplaced. In that case, the City of Beaverton had adopted a comprehensive plan that "designated two-thirds of plaintiffs' property as a site for a future public park." *Suess Builders*, 294 Or at 261. Although the city had designated only part of the plaintiff's

substantially interfere with owner's use and enjoyment of property and could constitute a taking even though no trespass occurred).

        [12] Those two categories of takings claims do not exhaust the field; other categories exist. *See, e.g., Dodd*, 317 Or at 181-82 (recognizing condemnation blight cases as a discrete category of takings cases).

property for future acquisition, the plaintiffs alleged that the city's actions had " 'irreversibly deprived the Plaintiffs of the fair rental value of *all* their property.' " *Id.* (quoting allegations) (emphasis added). Because the case arose on a motion to dismiss, the court had no occasion to consider whether the whole parcel rule applied: The complaint alleged that the entire property had no economically viable use after the city announced its intent to condemn part of it. Perhaps for that reason, the parties did not argue whether the whole parcel rule applied, and the court did not address that issue.

The decision in *Boise Cascade Corp.* is closer to the mark. In that case, a state wildlife rule prevented the plaintiff from logging any trees on 56 acres of a 64-acre parcel. 325 Or at 188-89. The plaintiff brought an action, alleging " 'depriv[ation] * * * of the only economically viable use of approximately 56 acres of merchantable timber.' " *Id.* at 198 (quoting complaint; brackets and ellipsis in original). The trial court dismissed the complaint because, among other reasons, it failed to state a takings claim under the state constitution. *Id.* at 190, 196-97. Before this court, the state did not argue that the whole parcel rule applied. Accordingly, this court did not address that question. Rather, it held that,

"[a]ssuming the truth of all well-pleaded facts alleged in the complaint and giving plaintiff the benefit of all favorable inferences that may be drawn from those facts, th[e plaintiff's] allegation is sufficient to meet the 'deprivation of all economically viable use of the property' standard."

*Id.* at 198.

We agree with plaintiff that, in deciding whether the complaint in *Boise Cascade Corp.* stated a regulatory taking claim under the state constitution, this court focused on the 56-acre parcel that the regulation affected rather than the larger 64-acre parcel that the plaintiff owned. That fact, however, adds little to plaintiff's argument. As noted, in *Boise Cascade Corp.*, the state did not argue before this court that the whole parcel rule should apply, and this court did not address, much less purport to resolve, that issue. We decline to convert the absence of any mention of the whole parcel rule

in *Boise Cascade Corp.* into a binding resolution of that rule's applicability under the Oregon Constitution.[13]

We note that, in other cases, this court has appeared to apply the whole parcel rule in deciding regulatory takings claims. *See, e.g., Dodd,* 317 Or at 185-86 (focusing on uses that remained in determining whether plaintiffs retained "some substantial beneficial use of their property"). The court did so, however, without discussing whether the whole parcel rule or some other rule should apply. *Id.* As a result, those cases are entitled to no greater weight than our decision in *Boise Cascade Corp.,* and the question whether the whole parcel rule applies under Article I, section 18, remains an open one.

Although the existing cases do not resolve the question, we think that the principles underlying the regulatory takings doctrine point the way to an answer. The court recognized in *Suess Builders* that government routinely regulates the use of private property to advance public policy and that it does so in ways that can affect, sometimes significantly, the property's value. *See* 294 Or at 258-59 (illustrating point). In the area of land use, government may impose height or size restrictions on buildings, prohibit or impose limitations on industrial and commercial uses in certain areas, or impose setback requirements that prevent property owners from building within a specified distance of their property lines. In each of those instances, government limits in one way or another the uses to which an owner may put his or her land, and it does so to advance broader public goals.[14]

This court has concluded that, as a general rule, "[r]egulation in pursuit of a public policy is not equivalent to

---

[13] The Court of Appeals opined that *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 581 P2d 50 (1978), also demonstrated that this court had rejected the whole parcel rule. *Coast Range Conifers,* 189 Or App at 546-47. The Court of Appeals read that decision too broadly. This court held in *Fifth Avenue Corp.* that the complaint failed to allege that the specific part of the plaintiff's property affected by the county's action retained no economically feasible use. *Id.* 282 Or at 614. In light of that failure, there was no need for the court to consider whether the whole parcel rule applied and consequently no discussion of that issue.

[14] We note that those regulations may, depending on a myriad of economic and other factors, increase or decrease the affected property's value.

taking for a public use, even if the regulated property is land." *Id.* at 259. Regulation, however, can go too far and become tantamount to a governmental appropriation of property. *See id.* at 259 n 5 (recognizing principle). Courts have employed different tests in attempting to determine when a regulation that reduces the subject property's economic value crosses that line. As noted, this court's approach, under the Oregon Constitution, has been to ask whether the regulation leaves the owner with any economically viable use of the property. *Boise Cascade Corp.*, 325 Or at 198.

■    The foregoing test for regulatory takings looks to the owner's ability to use the whole parcel and asks whether the remaining interests have any economically viable use. Were we to adopt a contrary rule and focus only on the interest affected by the regulation, an ordinance that prevented property owners from building homes within 10 feet of a street would "take" that 10-foot strip even though the property owner remained free to place the home elsewhere on the lot. We decline to adopt that approach and make explicit what is implicit in the state constitutional test for regulatory takings: Under Article I, section 18, of the Oregon Constitution, a court should consider a property owner's ability to use the whole parcel that he or she owns in determining whether the property retains any economically viable use.

■    To be sure, determining what constitutes the relevant parcel may present a close question in some cases. *Cf. City of Salem v. H.S.B.*, 302 Or 648, 653, 733 P2d 890 (1987) (discussing that issue in condemnation context); *Oregon R. & Nav. Co. v. Taffe*, 67 Or 102, 134 P 1024, *reh'g den*, 135 P 332 (1913) (same). The facts in this case, however, are straightforward. Plaintiff owns a contiguous 40-acre parcel of forest land. In determining whether plaintiff retains any economically viable use of that property, we look to plaintiff's ability to use the entire 40-acre parcel, not merely the nine acres of timber that the regulation affects.

Plaintiff argues alternatively that we should consider its interest in the timber separately from its interest in the real property. Under Oregon law, however, timber is part of the underlying real property unless it is subject to a

contract to be cut. ORS 71.1070(2);[15] *see Paullus v. Yarbrough*, 219 Or 611, 637, 347 P2d 620 (1959) (timber constitutes goods under Uniform Sales Act when agreement to sever timber exists). In this case, no contract to cut the timber existed, and no basis exists, as a matter of state property law, for viewing plaintiff's property interest in the timber as separate from its interest in the real property.[16]

■ It follows that, in determining whether the regulation at issue here deprived plaintiff of any economically viable use of its property, we focus on plaintiff's ability to use the 40-acre parcel, not merely on its ability to use the nine acres of timber. Viewed from that perspective, plaintiff's property has an economically viable use. The regulation leaves plaintiff able to log more than three fourths of its property. The regulation, in effect, is no different from a rule that permits a landowner to log three out of every four trees in order to prevent soil erosion. Because plaintiff's property has an economically viable use, the challenged regulation does not effect a taking under Article I, section 18, of the Oregon Constitution.

■ Having resolved plaintiff's claim under Article I, section 18, we turn to its claim under the Takings Clause of the Fifth Amendment. Plaintiff identifies four theories that, in its view, either entitle it to summary judgment or, at a minimum, require a jury trial. First, plaintiff argues that the state wildlife regulation does not substantially advance a legitimate governmental interest and is a taking under *Agins v. Tiburon*, 447 US 255, 100 S Ct 2138, 65 L Ed 2d 106 (1980). Second, plaintiff contends that, because the nine acres of timber has no economic value, the state has taken its property

---

[15] ORS 71.1070(2) provides, in part:

"A contract for the sale apart from the land * * * of timber to be cut is a contract for the sale of goods."

[16] Under the federal constitution, the fact that state law regards a property interest as separate does not necessarily mean that a regulation that prevents the owner from using that interest effects a taking. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 US 470, 498-502, 107 S Ct 1232, 94 L Ed 2d 1232 (1987) (holding that no taking occurred when state law prevented owner from mining support estate, which state regarded as separate property interest). Because we conclude that the timber in this case is not separate from the underlying real property, we need not decide whether we would find the federal analysis persuasive in interpreting Article I, section 18.

under *Lucas v. South Carolina Coastal Council*, 505 US 1003, 112 S Ct 2886, 120 L Ed 2d 798 (1992). Third, plaintiff argues that the state regulation results in a physical occupation of its land and is a *per se* taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982). Finally, plaintiff reasons that a jury should decide whether the regulation is a taking under the balancing test set out in *Penn Central*.

Plaintiff bases its first argument on *Agins*, which stated that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests." 447 US at 260. After oral argument in this case, the United States Supreme Court overruled that part of *Agins*, holding "that the 'substantially advances' formula announced in *Agins* is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation." *Lingle v. Chevron U.S.A., Inc.*, 544 US 528, 125 S Ct 2074, 161 L Ed 2d 876 (2005). After *Lingle*, plaintiff's first theory provides no basis for finding a taking.

Plaintiff bases its second theory on the Court's decision in *Lucas*. In that case, the Court held that a regulation that completely deprives an owner of "*all* economically beneficial uses" of his or her property is a taking. *Lucas*, 505 US at 1019 (emphasis in original). Plaintiff notes that the undisputed evidence in this case establishes that the state regulation deprived it of all economically beneficial use of nine acres of timber. It follows, plaintiff concludes, that the state took those nine acres.

In arguing that the regulation effected a taking under *Lucas*, plaintiff focuses solely on the part of its 40-acre parcel that the state wildlife regulation affected. Put another way, plaintiff's argument assumes that the whole parcel rule does not apply. That assumption is inconsistent with *Penn Central*, which explained:

> " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated * * * [T]his Court focuses rather on both the character of the

action and on the nature and extent of the interference with rights in the parcel as a whole."

438 US at 130-31. To be sure, the Court questioned the whole parcel rule in a footnote in *Lucas*. 505 US at 1016-17 n 7. Since then, however, it has reaffirmed the rule twice. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 US 302, 331, 122 S Ct 1465, 152 L Ed 2d 517 (2002) (rejecting argument that courts should consider only part of property affected by regulation and reaffirming whole parcel rule); *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 US 602, 644-45, 113 S Ct 2264, 124 L Ed 2d 539 (1993) (same).

Under the whole parcel rule, plaintiff's *Lucas* claim fails. Plaintiff's ability to log 31 acres of the 40-acre parcel establishes that the regulation does not deprive plaintiff's property of all its economic value. *See Palazzolo v. Rhode Island*, 533 US 606, 630-31, 121 S Ct 2448, 150 L Ed 2d 592 (2001) (wetlands regulations that prevented owner from developing two acres of a 20-acre parcel but permitted a single residence on remaining 18 acres did not "take" two acres under *Lucas*).[17]

Plaintiff bases its third federal takings argument on *Loretto*. The Court held in *Loretto* that an ordinance that authorized a company to place a permanent television cable on an apartment building constituted a taking. In reaching that conclusion, *Loretto* reaffirmed the rule that " '[t]he one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, "regularly" use, or "permanently" occupy, space or a thing which theretofore was understood to be under private ownership.' " 458 US 427 n 5 (quoting Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv L Rev 1165, 1184 (1967)). That was so, the Court concluded, even though the

---

[17] The Court assumed in *Palazzolo* that the whole parcel rule applied. 533 US at 631-32. In light of the Court's later reaffirmation of the whole parcel rule in *Tahoe-Sierra Preservation Council*, plaintiff's *Lucas* claim in this case has no greater vitality than the plaintiff's similar claim in *Palazzolo*.

physical occupation that New York City authorized in *Loretto*—placing a one-half inch cable and two cable boxes on the roof of an apartment building—was relatively minimal. *Id.* at 436-37.

Plaintiff argues that preventing it from logging the trees in which the bald eagles nested results in a physical occupation within the meaning of *Loretto*. But *Loretto* does not hold, as plaintiff argues, that state rules that prevent an owner from cutting a heritage tree, eradicating a rare native plant, or destroying an endangered species' habitat results in a physical occupation and thus a *per se* taking. State rules that prevent a property owner from altering a naturally occurring condition differ from rules that authorize a third person to enter and occupy another's property. The Court's decision in *Loretto* addresses only the latter class of rules; its reasoning does not extend to the separate class of rules at issue here, as the courts that have addressed that specific issue have agreed. *See Seiber v. United States*, 364 F3d 1356, 1366-67 (Fed Cir), *cert den*, 543 US 873 (2004) (so holding); *Boise Cascade Corp. v. United States*, 296 F3d 1339, 1352-57 (Fed Cir 2002), *cert den*, 538 US 906 (2003) (same); *Boise Cascade Corp. v. Board of Forestry*, 164 Or App 114, 125-26, 991 P2d 563 (1999), *rev den*, 331 Or 244 (2000) (same).

Finally, plaintiff contends that the trial court should have submitted its claim to a jury under a *Penn Central* balancing test. Plaintiff does not identify any disputed historical facts that are material to the *Penn Central* analysis. Rather, relying on *Florida Rock Industries, Inc. v. United States*, 18 F3d 1560, 1571-73 (Fed Cir 1994), *cert den*, 513 US 1109 (1995), plaintiff contends that only a jury can weigh the factors that the Court noted in *Penn Central* to determine whether a regulation effects a taking.

The Court held in *Penn Central* that no set formula exists to determine when a regulation will constitute a taking. 438 US at 124.[18] Rather, a number of factors come into play. Primary among them are:

---

[18] Since *Penn Central*, the Court has recognized two categories of *per se* regulatory takings: when the law authorizes a third person to occupy another's property permanently and when the regulation leaves the owner with no economically beneficial use of his or her property. *See Lingle*, 544 US at ___, 125 S Ct at 2081 (summarizing federal regulatory takings law).

"[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations[.] * * * So, too, is the character of the governmental action. A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government * * * than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."

*Id.* (citations omitted). In determining whether a regulatory taking had occurred, the *Penn Central* Court weighed those and other factors based on the historical facts that the state court had found. The Court did not remand the case so that a trier of fact could weigh those factors.

*Penn Central* makes clear that the question whether the undisputed historical facts establish that a challenged regulation effects a taking presents a question of law for the court. *Florida Rock Industries*, on which plaintiff relies, is not to the contrary. There, the Federal Circuit remanded to resolve a disputed issue of historical fact. *See* 18 F3d at 1571-73 (remanding to allow trial court to determine degree to which state wetlands development law impaired owner's investment-backed expectations). In this case, plaintiff does not argue that the historical facts are disputed. Rather, it argues that a jury should weigh plaintiff's investment-backed expectations against the state's interest in enforcing its wildlife regulations to determine whether the regulation took its property. Under *Penn Central*, the trial court properly reached the merits of plaintiff's claim and resolved it.[19] Having considered plaintiff's claims, we hold that the state's wildlife regulations did not take plaintiff's property under either Article I, section 18, of the Oregon Constitution or the Takings Clause of the Fifth Amendment.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

---

[19] We note that, beyond arguing that a jury should determine the merits of its *Penn Central* claim, plaintiff does not appear to advance any other argument in this court that the trial court erred in resolving its *Penn Central* claim. Having resolved the one issue that plaintiff raises, we do not reach any other issues that plaintiff might have raised in support of its *Penn Central* claim.