Argued and submitted December 20, 2016, affirmed June 1, 2017

Larry KAPLOWITZ
and Karin Marcus,
*Respondents,*

*v.*

LANE COUNTY,
*Respondent,*

*and*

Charles WIPER, III,
*Petitioner.*

Land Use Board of Appeals
2016029

Charles WIPER, III,
*Petitioner,*

*v.*

LANE COUNTY,
*Respondent,*

*and*

Larry KAPLOWITZ
and Karin Marcus,
*Respondents.*

Land Use Board of Appeals
2016030

A163509

398 P3d 478

Aaron J. Noteboom argued the cause for petitioner. With him on the brief was Arnold Gallagher P. C.

Zachary P. Mittge argued the cause for respondents Larry Kaplowitz and Karin Marcus. On the brief were William H. Sherlock and Hutchinson Cox.

No appearance for respondent Lane County.

Before Sercombe, Presiding Judge, and DeHoog, Judge, and Haselton, Senior Judge.

## SERCOMBE, P. J.

The issue in this land use case is whether the Land Use Board of Appeals (LUBA) properly deferred to Lane County's interpretation of the meaning of "accessory" use and development as used in the county's forestland zoning regulation. Under ORS 197.829(1), LUBA must affirm a county's interpretation of its land use regulations unless that interpretation is inconsistent with the text of the regulation or related policies.[1] Petitioner asserts that the county's interpretation is inconsistent with the purpose of the applicable forestland zoning provision and the state statutes and rules that regulate the content of that zoning regulation, and that, therefore, LUBA erred in deferring to the county's construction of the regulation. We review to determine whether the LUBA order was "unlawful in substance." ORS 197.850(9)(a). On review, we conclude that LUBA properly deferred to the county's interpretation of its regulation.

We state only the facts necessary to frame the code interpretation question at issue. Briefly put, intervenors-respondents Kaplowitz and Marcus (respondents) applied to Lane County for a zoning consistency determination to certify the lawfulness of an accessory use to their 3,600 square foot home. That residence is located on a 9.7 acre tract in rural Lane County that is zoned Impacted Forest Land (F-2).[2] The requested accessory use to be certified was

---

[1] ORS 197.829 provides:

"(1) The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"(a) Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b) Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c) Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d) Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements.

"(2) If a local government fails to interpret a provision of its comprehensive plan or land use regulations, or if such interpretation is inadequate for review, the board may make its own determination of whether the local government decision is correct."

[2] The F-2 zoning for the property allows the use of the land for forest operations and forest practices, agriculture, various types of residences, energy

a conversion of a 2,800 square foot portion of a 5,200 square foot horse barn and riding arena on the property into rooms (yoga/dance/music studio, a guest room, a recording studio, two storage rooms, two bathrooms, and a mudroom/entry foyer) for use by the permanent residents of the property and their guests. Respondents call this converted space their "sanctuary."

The proposed frequency of the sanctuary use changed during the local government proceedings. Ultimately, respondents proposed that they and their housemates would use the accessory structure on a daily basis for personal use (yoga, dance, meditation, and hobbies). Small groups of family and friends (five to 15 persons) would use the sanctuary on a weekly basis. Respondents proposed to host parties of less than 40 persons, up to eight times each year; and gatherings of 40 to 80 persons three or four times a year; and to conduct larger events for more than 80 persons, such as a wedding or bar mitzvah, no more than once a year.

The county planning director approved the application to certify the accessory use, and, upon further review, that approval was affirmed by the county hearings officer in initial and reconsidered decisions. The county board of commissioners affirmed the hearings officer decisions. Petitioner obtained review by LUBA, and LUBA affirmed the county's interpretation of the meaning of "accessory" uses and development in the F-2 zoning district.[3]

As noted, the F-2 zoning for the property allows "[u]ses and development accessory to existing uses and development." Lane Code (LC) 16.211(2)(o). LC 16.090 defines "accessory" to mean "[i]ncidental, appropriate and subordinate to the main use of a tract or structure." Before the county and LUBA, petitioner argued that the size and intensity of the

---

production, solid waste disposal, outdoor mass gatherings, habitat conservation, marijuana research, production, and distribution, and roads, together with a number of special or conditional uses. Lane Code (LC) 16.211(2). LC 16.211(2)(o) also allows "[u]ses and development accessory to existing uses and development," subject to specified siting standards, LC 16.211(8). LC 16.090 defines "accessory" to mean "[i]ncidental, appropriate and subordinate to the main use of a tract or structure."

[3] LUBA remanded the decision to the county to more formally impose a condition of approval of the accessory use that had been relied upon by the county to ensure that the use was accessory in nature.

proposed accessory use made it not "incidental, appropriate and subordinate" to the residential use of the property. The hearings officer initially ruled:

> "Essentially [petitioner] is arguing that the proposed use of the horse barn/arena, as converted, is not subordinate or in proper scale with the residential use of the property. * * *
>
> "* * * [The accessory use determination] is, by its very nature, quite broad and includes a determination of the appropriate use of the horse barn/arena. I maintain that the size of the structure has limited evidentiary value compared to the scope of the use proposed and its impact on the neighborhood. * * *
>
> "* * * * *
>
> "* * * The appropriate consideration, however, is whether the structure, as intended to be used in the future by [respondents], qualifies as a building and use that is truly accessory to the residential use of the subject property.
>
> "The pertinent issue is whether the accessory structure is subordinate to the residence or vice versa. Two factors are relevant to this inquiry. First, the intensity of the use of the accessory structure should be weighed against the intensity of the use of the residence. Second, the impact on the neighborhood from the use of the accessory structure and the residence should be compared. * * *
>
> "* * * * *
>
> "* * * The use of the accessory structure on a daily basis by [respondents] and housemates is, by definition, a reasonable and normal residential use, the scope of which is determined by the number of residents in the primary residence. The weekly meeting of a small group of friends also does not appear to exceed normal residential use as measured against households that host weekly bridge parties, poker games or book clubs. The monthly 'parties,' however, appear to approach the threshold of what might be considered a normal residential use; especially if the 'or more' substantially exceeds 40 individuals on a regular basis."

The hearings officer then examined whether the "impact on the neighborhood from [respondents'] accessory use is greater than what [a] reasonable person would expect

from the residential use of an accessory structure." He made findings regarding concerns about "increased fire danger, overuse of the access easement, water supply, noise, capacity of the septic tank systems, and light pollution from use of [the] easement." The hearings officer concluded that, for most of the proposed use, the impact of the accessory use would not be greater than what a reasonable person would expect from the residential use of an accessory structure. However, the hearings officer also concluded that the intensity of the proposed monthly parties could not "be considered as subordinate to the primary residential use of the subject property."

The hearings officer also determined that respondents' access road did not meet the siting standards in LC 16.211(8). Respondents obtained reconsideration of the initial hearings officer decision, and, based on additional evidence, the hearings officer approved the accessory use and development and the sufficiency of the access road. In the reconsidered decision, the hearings officer concluded that, although the record lacked evidence that parties of 40 to 80 persons was "normal" for a rural residential use,

> "[p]erhaps the best indication of residential use is not in regard to whether the intensity of usage is 'normal' for a rural residential lifestyle but rather whether it is truly residential in nature and whether it causes significant harm to adjacent and nearby uses. In regard to the former, one aspect of a residential use is that it does not involve commercial remuneration. [Respondents] have not proposed that they will be charging for the use of the accessory structure and this decision relies upon that assumption. A second aspect of a residential use is that [it] involves family, friends of the family, business associates, etc.; not the general public. Approval granted by this decision is based upon an understanding, clarified in the conditions of approval, that the larger events (except for the wedding-type celebration/reception activities) are not open to the general public but are constrained to individuals invited by [respondents]."

After making findings on the lack of harm to adjacent and nearby uses, the hearings officer concluded that respondents' "proposed use of the horse barn/arena, including the

three to four gatherings of 40 to 80 persons, can be considered a residential use of the structure." One of the conditions of approval was that "[t]he use of the accessory residential structure shall be confined to family, friends of family, and family guests for all events and shall not be offered to the general public nor used for commercial purposes." As noted, the board of county commissioners affirmed and adopted the reasoning in the hearings officer's decision on reconsideration and those portions of the hearings officer's initial decision that "found relevant approval criteria are met." The county expressly agreed with and adopted "the interpretations of Lane Code 16.211 made by the Hearings Official in the decision."

Before LUBA, petitioner disputed the county's application of the accessory use standards. He argued that "the proposed use is not an 'accessory' residential use as a matter of law and the application should therefore have been denied." Petitioner contended that the number of visitors and parking was "[o]n its face * * * not incidental or subordinate." Petitioner claimed that the interpretation of "accessory" use and development was inconsistent with the interpretation of a similar term made by LUBA in an earlier case, *McCormick v. City of Baker City*, 46 Or LUBA 50 (2003). Petitioner noted that the "stated purpose of the F-2 zone is to 'conserve forest land for uses consistent with Statewide Planning Goal #4'" and that the result in the case was inconsistent with that purpose. Petitioner further explained that the siting of dwellings on forestland is restricted under Goal 4, implying that the siting of accessory uses to dwellings should be also circumscribed in some fashion. Petitioner compared the less-intense accessory residential uses allowed in the county's rural residential zone to those allowed in the F-2 zone and argued that the F-2 accessory uses should be confined to even less intense uses than allowed in the rural residential zone, again because the stated purpose of the F-2 zone is to "conserve forest land for uses consistent with Statewide Planning Goal #4." Petitioner finally argued that the hearings officer's evaluation of the accessory quality of the use as to whether it was "residential in nature" and did not "cause[] significant harm to adjacent and nearby uses" was inconsistent with the text of LC 16.090 that defined "accessory" as "incidental,

appropriate and subordinate to the main use." Petitioner did not argue that the county's interpretation of the provision was not subject to deference under ORS 197.829, nor did petitioner advance an argument that the factors the county identified as relevant to determining whether a use was "accessory" were inconsistent with the purpose, text, or context of the relevant code provisions or Goal 4.

LUBA rejected petitioner's arguments, concluding that the county's interpretation of "incidental, appropriate and subordinate to the main use" was entitled to deference under ORS 197.829 and was consistent with the text of the provision. LUBA reasoned:

"LC 16.211(2)(o) allows '[u]ses and development accessory to existing uses and development' if specified siting standards are satisfied. LC 16.090 defines 'accessory' as '[i]ncidental, appropriate and subordinate to the main use of a tract or structure.' The LC does not further define those terms and dictionary definitions of the words 'incidental,' 'appropriate,' and 'subordinate' are not particularly helpful in this context.[5] The question for the county was whether the proposed sanctuary use, as proposed, is properly viewed as 'accessory' to the main use of the property, the 3,600 square foot residential use, because it is 'incidental,' 'appropriate' and 'subordinate' to the main residential use. That is obviously a subjective question, and the board of commissioners is entitled to deferential review of its understanding of the subjective standard that in inherent in that inquiry, under ORS 197.829(1) and *Siporen* [*v. City of Medford*, 349 Or 247, 243 P3d 776 (2010)].

_____

"[5] *Webster's Third New Int'l Dictionary* (unabridged ed 2002) sets out definitions of 'incidental' (1142); 'appropriate' (106) and 'subordinate' (2277). Those definitions are set out in part below[.]

"'**incidental** * * * **1:** something that is incidental : a subordinate or incidental item * * *.'

"'**appropriate** * * * **1:** specially suitable : FIT PROPER * * *.'

"'**subordinate 1:** placed in a lower order, class or rank : holding a lower or inferior position * * *.'"

(Boldface and first and second brackets in original.)

LUBA reiterated that the county's interpretation of "accessory" was not "inconsistent with the commonly understood meaning of the terms" used in the definition of "accessory" in the county code:

"In any event, * * * [under *Siporen*], the focus has always been on the text and context of the standard in question. As we have already noted, the meanings of the operative terms in this case, 'accessory,' 'incidental,' 'appropriate,' and 'subordinate' are subjective. The hearings official concluded that the more limited use of the sanctuary now proposed by the occupants of the residence on the property and their friends and invitees, with the commercial aspects of the prior use now relocated off-site, is properly viewed as incidental, appropriate and subordinate and therefore accessory to that residential use. The board of county commissioners adopted that interpretation as its own. We cannot say the board of commissioners' conclusion that the proposed use of the sanctuary qualifies as an accessory use is inconsistent with the commonly understood meaning of the terms the Lane Land Use and Development Code uses to define 'accessory use.'

"* * * * *

"The county's findings concerning whether the proposed use of the sanctuary can be considered a residential use and the potential impacts the sanctuary use might have on surrounding properties appear to have been adopted in response to [petitioner's] claim that the proposed use would not be subordinate to the existing residential use. We do not understand the county to have misunderstood that the controlling standard in this matter is whether the proposed use of the sanctuary is properly viewed as 'accessory' to the main residential use of the property and that the Lane County Land Use and Development Code defines an 'accessory' use as one that is '[i]ncidental, appropriate and subordinate to the main use of a tract or structure.' That the county employed surrogate inquiries to make that subjective determination is not error, so long as the county did not misunderstand the ultimate legal standard. We see no reason to believe the county failed to understand the applicable ultimate legal standard."

(Third brackets in original.)

On review, petitioner argues that LUBA erred in deferring to the county's interpretation of "accessory" use and development because the interpretation is not plausible as it is "contrary to Goal 4 and inconsistent with the purpose of LC 16.211 and the underlying policies which are the basis for the Lane Code." Petitioner asserts that LUBA did not "apply[] the analytical framework required by *Siporen*." Petitioner largely argues that LUBA confined its analysis of the meaning of "accessory" to the text of the definition of that term, but "stopped short of examining the applicable context," including "the purpose of" the F-2 zoning district, "the underlying policies which are the basis for the Lane Code," and statewide land use planning Goal 4. In petitioner's view, interpreting "accessory" use and development to allow the proposed residential accessory uses is contrary to the purpose of the F-2 zoning district to conserve forestland and inconsistent with the lesser scope of defined accessory uses in the rural residential zone. Finally, petitioner asserts that permitting residential accessory uses in the F-2 zone is contrary to Goal 4 and its implementing regulations, particularly OAR 660-006-0025, because that rule does not expressly allow residential accessory uses in the forestland zones.

In light of *Siporen* and subsequent cases applying *Siporen*, we conclude that LUBA did not err under ORS 197.829 in deferring to the county's interpretation of the meaning of "accessory" as defined by LC 16.090 and applied in the context of the F-2 zone. As noted, under ORS 197.829(1), LUBA is required to defer to a local government's interpretation of its land use regulations unless the interpretation is inconsistent with the express text of the regulation, the purpose of the regulation, the underlying policy implemented by the regulation, or a state law that the regulation carries out. The Supreme Court discussed the application of ORS 197.829(1) in *Siporen*, explaining that,

"when a local government plausibly interprets its own land use regulations by considering and then choosing between or harmonizing conflicting provisions, that interpretation must be affirmed, as held in *Clark* [*v. Jackson County*, 313 Or 508, 836 P2d 710 (1992),] and provided in ORS 197.829(1)(a), unless the interpretation is inconsistent with

*all* of the 'express language' that is relevant to the interpretation, or inconsistent with the purposes or policies underpinning the regulations."

349 Or at 259 (emphasis in original). The court further explained:

"To the extent that the interpretation is directed at a single term or statement, that means determining whether the interpretation plausibly accounts for the text and context of the term or statement. But, to the extent that the interpretation is directed at multiple statements that may be in conflict, the inconsistency determination is a function of two inquiries: (1) whether the interpretation in fact is an interpretation, *i.e.,* a considered determination of what was intended that plausibly harmonizes the conflicting provisions or identifies which ones are to be given full effect; and (2) the extent to which the interpretation comports with the 'express language' of the relevant provisions (including, necessarily, those provisions that, according to the interpretation at issue, are to be given full effect)."

*Id.* at 262. Furthermore, as we discussed in *Gould v. Deschutes County,* 272 Or App 666, 675, 362 P3d 679 (2015),

"[w]hether the county's interpretation of its code is inconsistent with the code, or the purposes or policies underlying the code, 'depends on whether the interpretation is plausible, given the interpretative principles that ordinarily apply to the construction of ordinances under the rules of *PGE* [*v. Bureau of Labor and Industries,* 317 Or 606, 610-12, 859 P2d 1143 (1993),] as modified by *State v. Gaines,* 346 Or 160, 171-72, 206 P3d 1042 (2009).' *Setniker v. Polk County,* 244 Or App 618, 633-34, 260 P3d 800, *rev den,* 351 Or 216 (2011) (internal quotation marks omitted; brackets in original). Merely because a stronger or more logical interpretation exists does not make a local government's interpretation implausible. *Siegert v. Crook County,* 246 Or App 500, 509, 266 P3d 170 (2011)."

Thus, in determining whether a local government's interpretation of its land use regulations is plausible and entitled to deference under ORS 197.829(1), LUBA and reviewing courts, in turn, must identify the local government code interpretation at issue and determine whether that interpretation is plausible given the express text of the

provision and related policies. Although the analysis echoes the statutory construction methodology set out in *PGE* and *Gaines*, we emphasize that the plausibility determination under ORS 197.829(1) is not whether a local government's code interpretation best comports with principles of statutory construction. Rather, the issue is whether the local government's interpretation is plausible because it is not expressly *inconsistent* with the text of the code provision or with related policies that "provide the basis for" or that are "implemented" by the code provision, including any ordained statement of the specific purpose of the code provision at issue.

The county interpreted LC 16.090, defining "accessory" as "[i]ncidental, appropriate and subordinate to the main use" of a structure, as requiring consideration of the size of the accessory use in relation to the size of the permitted residence, as well as an examination of the intensity of the use of the accessory structure as weighed against the intensity of the use of the residence. The county also concluded that an "appropriate" use required a comparison of the degree of the impact on the neighborhood from the use of the accessory structure and the residence. The county determined that a relevant consideration for whether an accessory use is "subordinate" to a residential use is that the use is residential—and not commercial—in character. Finally, the county concluded that an "incidental, appropriate and subordinate" accessory use in the forestland zone is one that is confined to use by residents of the tract and their guests, and not open to general use by the public.

Before LUBA and this court, petitioner does not take issue with the county's interpretation of LC 16.090 in those regards, much less explain why the interpretation is inconsistent with the text of the code definition or other code policies related to the definition of accessory uses. Instead, petitioner claims that the result in this case—the allowance of the sanctuary accessory use—is inconsistent with the purpose of the F-2 zoning to conserve forestland, with the allowed accessory uses in an unrelated zoning district, and with state regulations limiting the siting of dwellings on forestland.

We disagree. Even if the local and state policies were relevant context to the meaning of "accessory" uses, the county's interpretation of the meaning of that provision is not inconsistent with those policies under ORS 197.829. It is not inconsistent with the conservation of forestland to allow particular accessory uses for forestland dwellings, subject to siting standards for those uses. The meaning of accessory uses in the F-2 zoning district is not inconsistent with the meaning of those uses in the rural residential zoning district. Nor is it inconsistent with that allowance that state law limits the types of dwellings that can be permitted on forestland. Neither policy expressly limits or precludes accessory uses.[4]

LUBA concluded that the county's interpretation of the code definition of "accessory" uses and development was not inconsistent with the text of the relevant laws, and was, therefore, plausible and entitled to deference. We agree. Accordingly, LUBA's order was not unlawful in substance.

Affirmed.

---

[4] We question whether the referenced policies are relevant context to the meaning of "accessory" uses. The referenced policies—the ordained purpose of the F-2 zoning district, the content of an unrelated zoning district, and the limitations on the siting of dwellings on forestland in state regulations—are not policies that provide the basis for or that are implemented by the LC 16.090 definition of "accessory" uses and development. The LC 16.090 definition applies to all accessory uses, irrespective of any zoning district's particular allowance of accessory uses. The general purpose of the F-2 zone has nothing to do with the purpose of allowing "incidental, appropriate, and subordinate" accessory uses either in general or in the F-2 zoning district. The extent to which dwellings can be sited on forestland under local and state law is distinct from the issue of what are appropriate accessory uses to an allowed dwelling on forestland. Thus, those unrelated policies are immaterial to the ORS 197.829(1) inquiry.