Argued and submitted August 30, reversed and remanded on petitions and cross-petition October 12, 2022

Annunziata GOULD,
*Respondent*
*Cross-Petitioner,*

*v.*

DESCHUTES COUNTY,
*Petitioner*
*Cross-Respondent,*
*and*

20925 HARPER ROAD, LLC,
*Respondent*
*Cross-Respondent.*

Annunziata GOULD,
*Respondent,*

*v.*

DESCHUTES COUNTY,
*Respondent below,*
*and*

20925 HARPER ROAD, LLC,
*Petitioner.*

Land Use Board of Appeals
2022007; A178915

520 P3d 433

Deschutes County and the applicant for a conditional use permit to allow a personal-use airport on land zoned for exclusive farm use (EFU) seek judicial review of an order of the Land Use Board of Appeals (LUBA) remanding the county's approval for reconsideration, in part based on LUBA's interpretation of a Deschutes County Code provision relating to a requirement that the conditional use by located on "least suitable" farmland, and in part based on LUBA's conclusion that the county hearings officer had failed to fully address the intervenor's contentions relating to the compatibility of the use as relating to noise from the intended aircraft. Intervenor Gould has filed a cross-petition, asserting that LUBA erred in its determination that the applicant has satisfied the ownership or control requirements for approval of aircraft on a personal-use airport. *Held*: LUBA's order is unlawful in substance because, as contended by the county and by the applicant, LUBA failed to defer to the county's plausible construction of its own code provision relating to the "least suitable" requirement for a conditional use on EFU land. LUBA's order is also unlawful in substance because, as contended by intervenor, its determination that the applicant had satisfied the

ownership or control requirements for the aircraft intended to be used at the airport is contrary to statutory requirements.

Reversed and remanded on petitions and cross-petition.

David Doyle argued the cause and filed the briefs for petitioner-cross-respondent Deschutes County.

J. Kenneth Katzaroff argued the cause and filed the briefs for petitioner-respondent-cross-respondent 20925 Harper Road, LLC. Also on the briefs were D. Adam Smith and Schwabe, Williamson & Wyatt, P.C.

Jennifer M. Bragar argued the cause for respondent-cross-petitioner. Also on the briefs were Stephen W. Thorpe and Tomasi Bragar Dubay.

Before Tookey, Presiding Judge, and Egan, Judge, and Kistler, Senior Judge.

KISTLER, S. J.

Reversed and remanded on petitions and cross-petition.

**KISTLER, S. J.**

The dispute in this Land Use Board of Appeals (LUBA) case concerns the siting of a personal-use airport on land in Deschutes County zoned for exclusive farm use (EFU). The county, through a decision of a county hearings officer, approved an application submitted by 20925 Harper Rd, LLC (the applicant), for a conditional use permit to site a 2,000-foot-long by 75-foot-wide personal-use airstrip on EFU-zoned property. On intervenor Gould's appeal, LUBA remanded the matter to the county. The county and the applicant have separately petitioned for judicial review, and Gould has filed a cross-petition. Because we conclude that LUBA's order is unlawful in substance, we reverse and remand on both the petition and the cross-petition. *See* ORS 197.850(9)(a) (setting out standard of review).[1]

The subject property is a 122-acre, largely non-irrigated parcel that the applicant currently uses for alpaca grazing. The property consists of soil types VI, VII, and VIII. The applicant sought a permit for a personal-use airport, which is allowed as a conditional use on EFU land. ORS 215.283(2)(h); Deschutes County Code (DCC) 18.16.030(L).[2] The proposed location of the airport would be on land with type VI soil. The county's planning department approved the application, and Gould requested a hearing, challenging numerous aspects of the approval.

Before discussing the hearings officer's decision, we first provide some context for one of the issues that the

---

[1] In considering the petitions, we have disregarded the county's combined reply and cross-answering brief, which does not conform to ORAP 4.66(1)(c) and ORAP 5.70(3). Those rules do not allow a reply brief in a LUBA case except with leave of the court. *See* ORAP 5.70(3). The court issued a deficiency notice to the county with leave to correct the deficiency within 14 days, but no corrected brief or request for leave to file a reply brief was submitted.

[2] ORS 215.283(2)(h) provides a conditional use on EFU land for:

"Personal-use airports for airplanes and helicopter pads, including associated hangar, maintenance and service facilities. A personal-use airport, as used in this section, means an airstrip restricted, except for aircraft emergencies, to use by the owner, and, on an infrequent and occasional basis, by invited guests, and by commercial aviation activities in connection with agricultural operations. No aircraft may be based on a personal-use airport other than those owned or controlled by the owner of the airstrip."

The county has adopted DCC 18.16.030(L), which mirrors the statutory provision.

hearings officer decided. DCC 18.16.040(A)(3) requires that any conditional use allowed in EFU zones be sited on land that is "the least suitable for the production of farm crops and livestock."[3] The DCC also requires that all nonfarm dwellings be located on a parcel or part of a parcel that is "generally unsuitable" for farm use. DCC 18.16.050(G)(1)(iii). "Suitability" under the DCC is determined based on multiple criteria, including terrain, adverse soil or land conditions, drainage and flooding, vegetation, location, and the size of the tract. *Id.*[4]

In 2015, the Deschutes County Board of Commissioners issued a decision (the *Clough* decision) that considered the relationship between the "generally unsuitable" and the "least suitable" standards. The board explained in *Clough* that the "least suitable" for farm use standard "applies to all conditional uses allowed in the exclusive farm use zones" but that its application varies depending on whether the proposed use will be sited on land that is suitable for farm use or on land that is generally unsuitable for farm use.

When a proposed conditional use is sited on land that is suitable for farm use—namely, land that "merits Goal 3 protections because [it] contain[s] soils that are predominantly Class I through Class VI soils or [is] otherwise suitable for farm use"—the "least suitable" standard requires that the conditional use be located on the portion of the property that is "least suitable for the production of farm crops and livestock." In that situation, the "least suitable"

_____

[3] DCC 18.16.040(A)(3) requires:

"That the actual site on which the [conditional] use is to be located is the least suitable for the production of farm crops or livestock."

That standard is not required under state law but is a county standard that applies to all conditional uses allowed in EFU zones.

[4] *See also* ORS 215.284(2)(b) (providing, in part, that a nonfarm dwelling may be established on EFU land upon a finding that "[t]he dwelling is situated upon a lot or parcel or portion of a lot or parcel that is generally unsuitable land for the production of farm crops and livestock or merchantable tree species, considering the terrain, adverse soil or land conditions, drainage and flooding, vegetation, location and size of the tract"). Other local and state standards use the phrase "generally unsuitable" similarly. *See, e.g.*, OAR 660-033-0130(4)(c)(B)(i); DCC 18.16.055.

standard serves to minimize the loss of EFU land that could otherwise be put to farm use.

When, however, a proposed conditional use is sited on land that is "generally unsuitable" for farm use, that land "is not of sufficient value for farm use to merit distinguishing between areas that are generally unsuitable." That is, if two or more areas are "generally unsuitable" for farm use, trying to decide whether one area is more unsuitable for farm use than another does little to advance the purpose of the "least suitable" rule, which is to minimize the loss of EFU land that is suitable for farm use. It follows, the board of commissioners ruled in *Clough*, that siting a proposed conditional use on land that is generally unsuitable for farm use will categorically satisfy the county's "least suitable" requirement. There is no need to go further and decide whether the proposed site is the most unsuitable of all the generally unsuitable land.

In this case, the county hearings officer found "that the portion of the Subject Property to be used for the airstrip is generally unsuitable for farm crops or livestock." Following the board's decision in *Clough*, the hearings officer explained that the proposed site satisfied the county's "least suitable" requirement. Not only had the board explained in *Clough* that its "decision is intended to provide guidance to County hearings officers and staff regarding the proper application of the least suitable criterion," but the hearings officer concluded that the board's interpretation of its own rule in *Clough* directly controlled the application of the "least suitable" rule in this case. Because the hearings officer agreed with the county's determination that the conditional use would be sited on land that was "generally unsuitable" and, thus, was "least suitable," he upheld the approval.

The board of county commissioners declined to consider Gould's appeal, and the hearings officer's order became final.[5] Gould then appealed to LUBA, which reversed the county's determination. Among other things, LUBA disagreed with the hearings officer's determination that the

---

[5] The parties offer competing explanations as to why the board declined to hear Gould's appeal. We need not resolve that dispute to decide this case.

"least suitable" standard in DCC 18.16.040(A)(3) had been met. Relying on *Gutoski v. Lane County*, 141 Or App 265, 268, 917 P2d 1048, *rev den*, 324 Or 18 (1996), LUBA ruled initially that it need not defer to the hearings officer's interpretation of that standard. *Gould v. Deschutes County*, ___ Or LUBA ___, ___ (June 8, 2022) (slip op at 3). LUBA explained that, because the county board of commissioners had not reviewed the hearings officer's order in this case, there was no basis to impute the hearings officer's interpretation to the board of commissioners and, thus, no reason to defer to the hearings officer's interpretation. *Id.*

Having found that it need not defer to the hearings officer's interpretation of the "least suitable" standard, LUBA quoted its opinion in *Central Oregon Landwatch v. Deschutes County*, 78 Or LUBA 136, 147, *aff'd*, 295 Or App 451, 438 P3d 855 (2018), which, in turn, quoted another hearings officer's interpretation of the "least suitable" standard:

> "'Use of the word "least" indicates that there is only one site on a subject parcel that can meet the criterion. * * * The plain meaning of this criterion requires that the proposed conditional use be located on the single site on the subject property that is least suitable. On the other hand, the term "generally unsuitable" is broader and may encompass large swaths of land if it is all generally unsuitable for farm land.

> "'Since, by definition, every property will have a site that is the least suitable for farm production, the question is whether other sites on the subject property are less suitable than the proposed site.'"

*Gould*, ___ Or LUBA at ___ (slip op at 3) (quoting *Central Oregon Landwatch*, which in turn was quoting the hearings officer's reasoning in that case).[6] After quoting that passage

---

[6] In *Central Oregon Landwatch*, no one argued before LUBA that the hearings officer in that case had erred in interpreting the county's "least suitable" standard. *See* 78 Or LUBA at 147-48. Rather, the parties in *Landwatch* appear to have taken the hearings officer's interpretation of the "least suitable" standard as a given and disputed only whether a proposed nonfarm dwelling was sited on the least suitable part of a parcel that was generally unsuitable for farm use. *See id.* In *Coast Range Conifers*, the Supreme Court declined to view comparable statements as having precedential weight, which suggests that the hearings officer's analysis that LUBA recited in *Central Oregon Landwatch* is relevant for its persuasive value only. *See Coast Range Conifers v. Board of Forestry*, 339 Or 136, 148-49, 117 P3d 990 (2005).

from *Central Oregon Landwatch*, LUBA added that the hearings officer's interpretation of the least suitable standard in this case was incorrect because it "improperly insert[ed] the phrase 'generally unsuitable' into the [least suitable] standard." *Gould*, ___ Or LUBA at ___ (slip op at 3).

After determining that the interpretation of the "least suitable" standard quoted in *Central Oregon Landwatch* was either the only permissible interpretation or the preferred interpretation of that standard, LUBA concluded that "[w]hether the entire property [in this case] is generally unsuitable for the production of crops or livestock is not the applicable inquiry for determining the least suitable portion of the property for farm use." *Id.* LUBA accordingly ruled:

> "On remand, the hearings officer should consider other sites on the property identified during the proceedings below and determine the location of the least suitable site on the property for the production of crops or livestock, considering other factors such as, but not limited to, soil capability; the location of roads, dwellings, and farm operations; as well as any requirements necessary for the airport to function as intended."

*Id.* (slip op at 4).

Both the county and the applicant have petitioned for judicial review of LUBA's order and have assigned error to its ruling interpreting the "least suitable" standard.[7] They contend that: (1) the board's interpretation of the "least suitable" standard in *Clough*, which the hearings officer applied in this case, is plausible and (2) LUBA erred in failing to defer to that plausible interpretation. *See City of Medford v. Siporen*, 349 Or 247, 261, 243 P3d 776 (2010) (requiring LUBA to defer to a county's plausible interpretation of its own land use rules). Gould responds that, because the hearings officer's (and *Clough*'s) interpretation of the "least suitable" rule is inconsistent with the plain text of that rule, it does not warrant any deference even if deference would

___

[7] Gould argues that the county failed to preserve its objection to that ruling. We need not decide whether Gould's argument is correct. The applicant preserved an objection to the ruling, which is sufficient to put the issue before us. *See Just v. City of Lebanon*, 193 Or App 132, 135 n 2, 88 P3d 312 (2004) (reaching that conclusion in the context of standing).

otherwise be due. Additionally, she argues that, even if the hearings officer's interpretation of the "least suitable" standard were plausible, LUBA is obligated to defer to the county board of commissioners' plausible interpretation of the county's rule, not a hearing officer's interpretation. We review LUBA's order to determine whether it is unlawful in substance. ORS 197.850(9)(a).

We begin with the first issue that the county and the applicant raise—whether the hearings officer's interpretation of the "least suitable" standard is plausible. In undertaking that inquiry, we are mindful that our standard of review is highly deferential. ORS 197.829(1) requires LUBA to defer to a local government's interpretation of its own land use regulations unless the interpretation is inconsistent with the express text of the regulation, the purpose of the regulation, the underlying policy implemented by the regulation, or a state law that the regulation purportedly carries out. *See Kaplowitz v. Lane County*, 285 Or App 764, 773, 398 P3d 478 (2017). The "existence of a stronger or more logical interpretation does not render a weaker interpretation implausible." *Mark Latham Excavation, Inc. v. Deschutes County*, 250 Or App 543, 555, 281 P3d 644 (2012); *see also Gould v. Deschutes County*, 272 Or App 666, 684-85, 362 P3d 679 (2015) ("Merely because a stronger or more logical interpretation exists does not make a local government's interpretation implausible."). As the court explained in *Siporen*,

> "when a local government plausibly interprets its own land use regulations by considering and then choosing between or harmonizing conflicting provisions, that interpretation must be affirmed, as held in [*Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992),] and provided in ORS 197.829 (1)(a), unless the interpretation is inconsistent with *all* of the 'express language' that is relevant to the interpretation, or inconsistent with the purposes or policies underpinning the regulations."

349 Or at 259 (emphasis in original).

In arguing that the hearings officer's interpretation is inconsistent with the plain language of the "least suitable" rule and thus not plausible, Gould adopts two propositions that LUBA set out in its opinion in this case.

First, LUBA explained (and Gould agrees) that the use of the term "least" in the "least suitable" rule means that "there is only one site on a subject parcel that can meet the criterion." *Gould*, ___ Or LUBA at ___ (slip op at 3) (internal quotation marks omitted). That observation led LUBA to disagree with the hearings officer that a parcel of land that is "generally unsuitable" for farm use can contain more than one site that will satisfy the "least suitable" standard. Second, LUBA faulted the hearings officer for "improperly insert[ing] the phrase 'generally unsuitable' into the [least suitable] standard." *Id*. Gould concludes that, because the hearings officer's (and *Clough*'s) interpretation of the "least suitable" rule is squarely inconsistent with the rule's plain text, it is not a plausible interpretation of the rule.

        One difficulty with Gould's textual argument is that it focuses on the "least suitable" rule without asking how that rule and the "generally unsuitable" rule should be interpreted together; specifically, how should the "least suitable" rule be interpreted when a conditional use is proposed to be sited on land that is "generally unsuitable" for farm use? As we read *Clough* and the hearings officer's order following it, neither the county board nor the hearings officer impermissibly inserted the phrase "generally unsuitable" into the "least suitable" rule; rather, *Clough* and the hearings officer used the phrase "generally unsuitable" in seeking to read two potentially conflicting rules—the "least suitable" rule and the "generally unsuitable" rule—together. That is precisely what the Supreme Court has explained a local government may and should do. *See Siporen*, 349 Or at 259 (recognizing that, in interpretating its own land use regulations, a local government may sometimes be required to "choos[e] between or harmoniz[e] conflicting provisions").

        Nor can we say, as Gould would, that *Clough*'s reconciliation of those two rules is at odds with the plain text of the "least suitable" rule. Gould's textual argument focuses on the word "least" but overlooks the word "suitable." As the board pointed out in *Clough*, the "least suitable" rule assumes that a proposed conditional use will be sited on land that is "suitable for the production of farm crops and livestock." When, however, a proposed conditional use is

sited on land that is "generally unsuitable" for farm use, the board reasonably determined in *Clough* that the least suitable rule does not require an applicant to prove that one parcel of generally unsuitable land is more unsuitable than another parcel of generally unsuitable land. Given the text and the purposes of the "least suitable" rule, the board reasonably determined that the marginal value of such an inquiry is minimal, if not nonexistent.

It may well be that LUBA and Gould's interpretation of the "least suitable" rule is a plausible one. However, the board's interpretation of the "least suitable" rule in *Clough*, which the hearings officer followed, is an equally plausible, if not a preferable, interpretation because it reasonably reconciles both the "least suitable" rule and the "generally unsuitable" rule. Having reached that conclusion, we turn to the other issue that the county and the applicant raise—whether LUBA should have deferred to the hearings officer's interpretation of the "least suitable" rule.

On that issue, LUBA reasoned that, although it would owe deference to the county board of commissioners' permissible interpretation of its own land use rule, it owed no deference to the hearings officer's interpretation of the county's rule. That was so, LUBA concluded, even though the hearings officer in this case was merely applying the county board of commissioners' interpretation of the county's rule in *Clough*.

If, as no one disputes, LUBA must defer to a county's plausible interpretation of its own rule, it is difficult to see why the result should be any different when, as in this case, a hearings officer's order involves nothing more than a straightforward application of the county's plausible interpretation of its own rule. This is not a case in which a hearings officer interpreted and applied a county rule that the county had never interpreted. Nor is it a case in which the hearings officer applied the county's interpretation of its rule in such a novel or unexpected manner that the hearings officer's application went beyond what the county had intended. Rather, this case involved nothing more than a run-of-the-mill application of the county board of commissioners' interpretation of the county's rule in *Clough*.

LUBA, however, reasoned that, under our decision in *Gutoski*, no deference was due the hearings officer's application of the county's interpretation of its own rule. As LUBA correctly noted, we explained in *Gutoski* that LUBA must defer to a local governing body's permissible interpretation of its local land use legislation, not to the interpretations of hearings officers or other subordinate local officials. 141 Or App at 268 (citing *Gage v. City of Portland*, 319 Or 308, 877 P2d 1187 (1994)). And *Gutoski* held that, when a county board of commissioners merely declines to review an order of a county hearings officer, that fact does not warrant imputing the hearings officer's construction to the board of commissioners. *Id.*

In *Gutoski*, however, the hearings officer was not following a preexisting county construction of a county code provision, as the hearings officer was in this case. *Gutoski* thus provided no occasion to consider, as this case does, whether a hearings officer's application of a county governing body's preexisting construction of its own land use rule is entitled to deference. The distinction makes a difference.

In *Gage*, the Supreme Court explained that there are "two fundamental principles" at play in the rule of deference that the court articulated in *Clark*:

> "First, deference is due a local governing body's interpretation of its own ordinance, because that governing body is composed of the politically accountable representatives elected by the community affected by the ordinance. Second, and perhaps more important, deference is due a local governing body's interpretation of its own ordinance, because that governing body is the legislative body responsible for enacting the ordinance and may be assumed to have a better understanding than LUBA or the courts of the intended meaning of the ordinance."

*Gage*, 319 Or at 316-17. For both those reasons, *Gage* explained, deference is not warranted when the decision is made by a county hearings officer rather than by a board of commissioners. *Id.* at 317.

In this case, however, the hearings officer was applying the county board of commissioners' interpretation of the "least suitable" rule, and the two reasons that the

court articulated in *Gage* for deferring to the county's permissible interpretation of its own rule apply equally to the hearings officer's straightforward application of the county's interpretation in *Clough*. Gould offers no persuasive reason why we should conclude otherwise. We accordingly hold that LUBA's failure to defer to the county's construction of DCC 18.16.040(A)(3), which, as we have determined, is plausible, was unlawful in substance. *See Siporen*, 349 Or at 261 ("A LUBA decision is "'unlawful in substance'" (in at least one way) if, in contravention of the standard of review set out at ORS 197.829(1), LUBA substitutes its own interpretation of a local government's land use regulations for a plausible interpretation of those regulations offered by the local government.").

The applicant's petition for judicial review raises three additional assignments of error, to which we now turn.[8] All three assignments of error concern DCC 18.128.015(B), which requires the hearings officer to determine the "compatibility" of the applicant's "proposed use with existing and projected uses on surrounding properties."[9] Before the hearings officer, Gould challenged the county's compatibility determination regarding noise that she anticipated one of the applicant's two planes, a De Havilland, would generate.

---

[8] We reject Gould's contention that, technically, the applicant, 20925 Harper Rd, LLC, did not "appear" before LUBA because of a minor misspelling of its name in the appeal to LUBA. The typographical error did not change the applicant's identity or party status.

[9] DCC 18.128.015 provides additional standards for most conditional uses:

"Except for those conditional uses permitting individual single family dwellings, conditional uses shall comply with the following standards in addition to the standards of the zone in which the conditional use is located and any other applicable standards of the chapter:

"A. The site under consideration shall be determined to be suitable for the proposed use based on the following factors:

"1. Site, design and operating characteristics of the use;

"2. Adequacy of transportation access to the site; and

"3. The natural and physical features of the site, including, but not limited to, general topography, natural hazards and natural resource values.

"B. The proposed use shall be compatible with existing and projected uses on surrounding properties based on the factors listed in DCC 18.128.015(A).

"C. These standards and any other standards of DCC 18.128 may be met by the imposition of conditions calculated to ensure that the standard will be met."

The hearings officer rejected Gould's challenge, but LUBA reversed, agreeing with Gould that the hearings officer had not adequately addressed that issue. In its third and fourth assignments of error, the applicant challenges LUBA's ruling.

The record shows that the hearings officer was aware of the parties' competing views about the noise a De Havilland can generate on takeoff and landing. The hearings officer did not separately address the issue of noise regarding the De Havilland. However, he determined, in essence, that any adverse impact from the combined noise of the two aircraft taking off and landing from the proposed strip was *de minimis*:

> "Based on the minor and temporary addition of noise associated with the proposed airstrip, I find that the use is compatible with other uses on surrounding properties as well. With less than one takeoff and landing per day, each climbing or descending over adjacent properties for 11 seconds or less, it is likely that many users of the surrounding properties will not even observe the operation. The total takeoff and landing time when these impacts exist is less than two hours spread out over the course of [an] entire year. I agree with [intervenor] that this is a *de minimis* impact and, therefore, compatible with those surrounding lands."

Although Gould argued and LUBA agreed that the hearings officer's finding should have addressed the noise generated by the De Havilland separately, we conclude that the hearings officer's order is sufficient. The finding of a *de minimis* effect adequately addressed both the issues of frequency and level of noise from both planes taking off and landing on the proposed airstrip. LUBA erroneously concluded otherwise.

In its fifth assignment of error, the applicant argues that LUBA erroneously concluded that the hearings officer's findings—that the proposed airstrip is compatible with golden eagle nesting sites on the surrounding properties— were deficient in one respect and questionable in another.[10]

---

[10] DCC 18.128.015(B) required the hearings officer to consider whether the applicant's proposed use is compatible with "existing and projected uses" on surrounding properties. "Existing and projected uses" is not limited to environmental uses, such as golden eagle nesting sites. However, that is the one use on which

The applicant contends that the county has determined that golden eagles and their nesting sites are a resource under Goal 5 of the land use laws, that personal-use airports are a potentially competing use, and that the county has adopted an overlay zone that ensures, as a matter of law, that the applicant's proposed airstrip will be compatible with the golden eagle nesting sites for the purposes of DCC 18.128.015(B).

As we read LUBA's opinion, it concluded that the hearings officer's findings did not address the applicant's Goal 5 argument, and it remanded to the hearings officer to do so.[11] Additionally, LUBA explained that the single compatibility issue that the hearings officer did discuss—the ability to get an incidental take permit under federal law if the applicant's personal-use airport resulted in death or injury to a golden eagle—provided no reason to think that the airport was compatible with the nesting sites on surrounding land. We cannot say that LUBA erred. To be sure, LUBA's resolution of this issue avoided deciding the applicant's claim that the county's Goal 5 program establishes, as a matter of law, that its proposed airstrip is compatible with the golden eagle nesting sites. However, we cannot say that it was error to allow the hearings officer to address that issue in the first instance, especially since the hearings officer's reliance on the ability to obtain an incidental take permit seems, as LUBA explained, at odds with the compatibility determination the hearings officer was charged with making.

Having considered the county and the applicant's petitions for review, we turn to Gould's cross-petition. ORS 215.283(2)(h) provides that a personal-use airport is

"restricted, except for aircraft emergencies, to use by the owner, and, on an infrequent and occasional basis, by

the parties have focused. We observe, as LUBA noted, that the applicant has not disputed that the phrase "existing and projected uses" in DCC 18.128.015(B) includes golden eagle nesting sites.

[11] LUBA's instructions on remand can be read in more than one way, but we conclude, as does Gould, that LUBA instructed the hearings officer to explain on remand how much weight the county's Goal 5 program should be given in determining whether the proposed personal-use airport is compatible with the golden eagle nesting sites.

invited guests, and by commercial aviation activities in connection with agricultural operations. *No aircraft may be based on a personal-use airport other than those owned or controlled by the owner of the airstrip.*"

(Emphasis added.) Under that statute, two questions are relevant in deciding whether planes may be based on a personal-use airstrip: Who owns the airstrip and who owns or controls the planes. Only if the entity that owns the airstrip also owns or controls the aircraft based there is the statute satisfied.

In this case, 20925 Harper Rd, LLC, holds title to the land on which the airstrip is to be sited. Two other, separate LLCs own the two planes to be based on the airstrip. The Willow Trust, a revocable trust, is the sole member of each of the three LLCs, and Alexander Polvi is the trustor and the trustee of the Willow Trust.

Given that structure, Gould argued before the hearings officer that 20925 Harper Rd, LLC, owns the airstrip[12] but that 20925 Harper Rd, LLC, neither owns nor controls the two planes to be based there. The hearings officer disagreed, reasoning:

"I find that, based on the current corporate structure, * * * Mr. Polvi is the individual that controls the aircraft and he also owns the airstrip."

That is, the hearings officer concluded that ORS 215.283(2)(h) was satisfied because the person who owns the airstrip (Polvi) also controls the aircraft to be based there. The hearings officer recognized, however, that the "current corporate structure" could change in the future or, alternatively, that other individuals or entities could become members of the LLCs or trustees of Willow Trust. Accordingly, the hearings officer conditioned approval of the site on a requirement that the existing corporate structure remain unchanged or that, if the corporate structure changed, only aircraft owned or controlled by the owner of the airstrip be based there.

_____

[12] Gould's argument assumes that the entity that owns the property on which the airstrip will be sited "owns the airstrip," as that phrase is used in ORS 215.283(2)(h). That assumption may not always be correct; however, this record provides no basis for questioning Gould's assumption.

Before LUBA, Gould argued, among other things, that the hearings officer erred because Polvi does not own the airstrip; she contended that 20925 Harper Rd, LLC, does. LUBA disagreed, reasoning:

"[T]he plain, ordinary meaning of the word 'owner' includes 'one that owns **:** one that has the legal or *rightful title whether the possessor or not.' Webster's Third New Int'l Dictionary* 1612 (unabridged ed 2002) (boldface in original; emphasis added). Accordingly, the hearings officer correctly interpreted ORS 215.283(2)(h) to conclude that the limited liability company 'owner of the airstrip' is the same as the limited liability companies that 'own[] or control[]' the aircraft because all are owned by the same revocable trust of which Polvi is the sole trustee, as explained by intervenor during the proceedings before the hearings officer."

(Emphasis LUBA's.) LUBA concluded, in essence, that the separate LLC identities of the aircraft and the airport could be disregarded because Willow Trust, which is the sole member of the various LLCs, owns both the airstrip and the aircraft.

On judicial review, Gould repeats her claim that neither Polvi nor Willow Trust owns the proposed airstrip. Rather, 20925 Harper Rd, LLC, is the owner. Relatedly, Gould argues that 20925 Harper Rd, LLC, does not own the two aircraft. She also asserts, in a single sentence and without any explanation, that 20925 Harper Rd, LLC, has not established that it controls the aircraft. For those reasons, Gould contends, LUBA erred in authorizing the two aircraft to be based at the proposed airstrip. The applicant responds that ORS 215.283(2)(h) does not specify the *type* of owner or exclude "indirect ownership" such as that present here, where Polvi ultimately is the owner of all the properties.

We agree with Gould that LUBA erred. As the dictionary definition cited by LUBA shows, an "owner" is the entity that holds title to the property. The titles to the land and to the two aircraft are held by three separate LLCs that, under Oregon law, are legally able to own property and hold title. ORS 63.077(2)(b) (listing among the powers of an LLC the ability to "[p]urchase, take, receive, lease, or otherwise acquire, own, hold, improve, use and otherwise deal in or with real or personal property or any interest in

real or personal property, wherever situated"). As the sole member of each of the three LLCs, Willow Trust does not have an ownership interest in the LLCs' real or personal property. *See* ORS 63.239 ("A membership interest is personal property. A member is not a co-owner of and has no interest in specific limited liability company property."). It follows that, under Oregon law, neither Willow Trust nor Polvi owns either the airstrip or the aircraft.[13]

We do not see any basis in either the text or context of ORS 215.283(2)(h) for saying that the terms "own" and "owner" should not be given their ordinary meaning. We accordingly agree with Gould that neither Polvi nor Willow Trust owns the proposed airstrip or the two planes. Rather, 20925 Harper Rd, LLC, owns the proposed airstrip, but it does not own the two aircraft that will be based there. The two separate LLCs do. LUBA's order concluding otherwise is unlawful in substance. *See Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001) ("A LUBA order is unlawful in substance 'if it represented a mistaken interpretation of the applicable law.'").

The remaining question under the statute is whether 20925 Harper Rd, LLC, the owner of the proposed airstrip, controls the two aircraft. Neither the hearings officer nor LUBA addressed that issue. It may be that Polvi, through Willow Trust, controls each of the three separate LCCs. The question, however, that the statute poses—whether 20925 Harper Rd, LLC, controls the other two LLCs or the planes that those LLCs own—presents a separate, distinct issue. Neither Gould nor the applicant has briefed that issue in any substantial way, and we conclude that the better course is to remand that issue so that the parties can brief and LUBA can resolve it in the first instance.

Reversed and remanded on petitions and cross-petition.

---

[13] Consistently, in an action against one or all of the LLCs, ORS 63.165(1) would shield the trust and derivatively Polvi from vicarious liability for the LLCs' torts. *See Cortez v. Nacco Materials Handling Group*, 356 Or 254, 264-69, 337 P3d 111 (2014) (explaining when ORS 63.165(1) will shield the sole member of a member managed LLC from liability).